



**HB**

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER**, a.k.a. **Ray Gordon**, d/b/a **Snodgrass Publishing Group**, 4247 Locust Street, #806 Philadelphia, PA 19104 | : : : : : | |
| Plaintiff, | : : : | **CASE NO.:** 05CV 2752 |
| v. | : : | **Hon. J.** ~~Bartle~~ |
| **Learn The Skills Corp.**, c/o Business Filings, Inc., 9 East Lockerman Street, Suite 205, Dover, DE 19901; **Formhandle@Fastseduction.com**, c/o Business Filings, Inc., 9 East Lockerman Street, Suite 205 Dover, DE 19901; **Thom E. Geiger**, 817 North McCrary Road, Columbus, MS 39702-4320; **Paul Ross**, a/k/a "Ross Jeffries" a/k/a ErosLA77@aol.com, 310 Tahiti Way, Marina Del Ray, CA, 90292-6789, **Trustees of the University of Pennsylvania**, 133 South 36th Street, 3rd Floor, Philadelphia, PA 19104, **Matthew S. Wolf, Esq.**, 1236 Brace Road, Unit K, Cherry Hill, NJ, 08034, and John Does 1-10, | : : : : : : : : : : : : : : : : | **FILED** JUN - 9 2005 MICHAEL E. KUNZ, Clerk By _____ Dep. Clerk |
| Defendants. | : | |

## COMPLAINT FOR RACKETEERING (RICO), CIVIL CONSPIRACY, INJURIOUS FALSEHOOD, INVASION OF PRIVACY, FRAUDULENT/NEGLIGENT MISREPRESENTATION, ABUSE OF PROCESS, AND LANHAM ACT VIOLATIONS

    **Plaintiff** Gordon Roy Parker, in the above-styled action, states his claims and prayers for

relief, and in support thereof, sets forth and avers the following:

## THE PARTIES

1.    Plaintiff **Gordon Roy Parker**, a.k.a. Ray Gordon, is an adult male resident of the

Commonwealth of Pennsylvania, domiciled and residing at 4247 Locust Street, #806,

Philadelphia, PA 19104.  Plaintiff is the sole owner of Snodgrass Publishing Group, a

Pennsylvania sole proprietorship and internet publisher, whose website is located at

www.cybersheet.com, and whose seduction advice websites are located at

http://www.cybersheet.com/library.html and http://www.cybersheet.com/easy.html.

2.    Defendant **Learn The Skills Corp.** ("LTSC") is a Delaware corporation that can be served at the address listed for its registered agent in the caption. Defendant LTSC is the publisher of the websites located at www.fastseduction.com and www.pickupguide.com.

3.    Defendant **Thom E. Geiger** resides in Columbus, Mississippi, and can be served at the address listed for him in the caption.

4.    Defendant **Paul Ross** (a/k/a "Ross Jeffries" and a/k/a ErosLA77@aol.com), resides in Ventura, California, and can be personally served at the address listed for him in the caption, or at any of his scheduled public appearances that are listed on his website.

5.    Defendant **Trustees of the University of Pennsylvania** ("Penn") is a Pennsylvania nonprofit corporation that can be served at the address listed for it in the caption.

6.    Defendant **Matthew S. Wolf,** Esq. is an attorney licensed in New Jersey and Pennsylvania, who can be served at the address listed for him in the caption.

7.    Defendant **Formhandle@Fastseduction.com** ("Formhandle") is the owner or one of the owners of Defendant LTSC who does business as "Formhandle." He can be served through LTSC's registered agent as listed above.

**NATURE OF CASE/STATEMENT OF JURISDICTION AND VENUE**

8.    The genesis of this cause of action is a RICO enterprise heretofore called "The Seduction Mafia." It is an internet-based, association-in-fact enterprise which consists of its three principals, Defendants Geiger, LTSC, and Ross, and whose mission is to control the flow of revenue from e-commerce relating to the alt.seduction.fast USENET group.

9.    During the time in controversy in this action, The Seduction Mafia has also actively solicited assistance in its mission from a number of other internet users ("operatives"), whose

purpose is to commit predicate acts against Plaintiff while distancing the Seduction Mafia

principals from liability.

10.    Actions taken in the establishment and furtherance of the Seduction Mafia's

operations have also given rise to causes of action for civil conspiracy, injurious falsehood,

tortious interference, invasion of privacy, fraudulent/negligent misrepresentation, abuse of

process, and Lanham act violations.

11.    Jurisdiction in the Eastern District of Pennsylvania federal court is proper under 28

USC §1331 and §1338(a) because of the existence of federal questions, the Racketeer Influenced

Corrupt Organizations Act of 1970 (18 USC §1961 *et seq.*,), the Lanham Act (15 USC §1125 *et*

*seq.*), Hobbs Act (18 USC §1951 *et seq.*), 18 USC §1510-13 (including Sarbanes-Oxley Act

violations), and 18 USC §1030(a)(7) relating to threatening a protected computer.  The state-law

claims against Defendant Geiger are also based on diversity pursuant to 28 USC §1332 and

Defendant Geiger's having contacts with Pennsylvania, or alternatively, Pennsylvania's "long-

arm" statute, through his participation in the Seduction Mafia, and because his conduct was

expressly targeted at Pennsylvania residents.

<u>**CONCISE SUMMARY OF THE CASE**</u>[1]

12.    This case alleges an internet-based racketeering conspiracy that uses extortion in

violation of the Hobbs Act against all of its targets, and which has used violations of the

Sarbanes-Oxley Act and a host of other state and federal laws (many of which give rise to causes

of action themselves) against Plaintiff and to further its mission, which is to extort money in the

form of affiliate commissions from any "seduction gurus" who wish to sell information products

over the internet in general, and who wish to participate on internet message boards, including

but not limited to those on USENET.  The Seduction Mafia is based on a USENET group known

---

[1] While this concise summary is not a requirement in the district courts, it should be.

as ***alt.seduction.fast*** ("ASF").  Businesses which do not pay this extortion money are subject to defamation, harassment, threats of violence, further extortion, defamation, and tortious interference, among other sanctions.  Each named Defendant in this action either directed the Seduction Mafia as a principal, or carried out its mission as an operative.

13.    Internet commerce is highly vulnerable to behavior commonly attributed to organized-crime when engaged in "offline" (i.e., in the "real world").  Our criminal and civil RICO laws recognize "mafia" attempts to corner an industry or part thereof, and list many predicate acts which, when engaged in by two or more persons, in concert, and for the purpose of gaining pecuniary advantage, give rise to a private or government cause of action under RICO.  On the internet, however, its "mafias" are more subtle, more easily constructed (and disbanded), and far more difficult to prove the existence of, due to easy anonymity for internet users (perfect for hiding a conspiracy), and due to 47 USC §230, which provides immunity for ISPs, webhosts, and message-board hosts.  Because of §230, someone who wants to defame others can set up their own message board, post to it as a third party from a public computer, claim they were not the author and that they are immune under §230, and further claim that they cannot trace the original publisher, thus committing a "perfect crime."  Similarly, individuals who appear to have no connection can act in concert and disclaim a conspiracy in a way that our laws make extremely difficult to prove.  A typical internet mafia will have one or more ringleaders who profit from the pattern of racketeering activity, and multiple "operatives" who are either compensated or who decide to act in furtherance of the conspiracy based on a separate motive, usually an "axe to grind" against one or more of its targets.

14.    The Seduction Mafia alleged in this Complaint is an association-in-fact enterprise of individuals and businesses who have acted in concert for the purpose of securing revenue for its

principals, Defendants LTSC/Formhandle and Ross. It was created through an agreement by Defendants Ross Jeffries and Formhandle, for the purpose of increasing revenue and goodwill for both the Speed Seduction and LTSC websites. Its behavior mirrors that of a traditional mafia: its self-declared "exclusive marketing turf" is the ASF newsgroup on USENET, and the enterprise's operations have the common objective of "protecting" that turf for profit motive.

### SEDUCTION MAFIA OPERATIONS, OPERATIVES, AND PRINCIPALS

15. Plaintiff incorporates by reference, as if fully stated verbatim herein, the entire contents of paragraphs 1-14 above.

16. The means by which the Seduction Mafia carried out its enforcement of its claim to ASF during the time in controversy include the following tactics:

    a)    Organizing a large group of individuals to defame Plaintiff personally and professionally, often while promoting the LTSC website, and often through the use of anonymous remailers.

    b)    Commissioning several Seduction Mafia operatives to harass, threaten and extort Plaintiff through the use of fear and coercion for the purpose of obtaining property in the form of business revenue and goodwill.

    c)    Agreeing to publish an "ASF FAQ" document (on a weekly basis) which promotes the LTSC and Speed Seduction websites as the "main group-related sites" on ASF, and which is designed to confuse the "newbie" (new user of ASF) into thinking that the websites are somehow formally affiliated with the ASF group, thus establishing it as Seduction Mafia "turf."

17. Through the commission of multiple predicate acts, and even more aiding-and-abetting nonpredicate acts, the Seduction Mafia has systematically harmed Plaintiff in his business, and derived tangible and intangible pecuniary benefit as a direct consequence.

## Averments Specific To Defendant Ross

18. Defendant Ross is the "mastermind" of the Seduction Mafia, is primarily responsible for its creation, and is one of its principals. Defendant Ross profits from the enterprise through his website located at http://www.seduction.com.

19. From 1994-1998, the ASF newsgroup existed on USENET as a solution to a growing problem in other romance groups (such as alt.romance and soc.singles) which were finding more and more discussions devoted to Speed Seduction. This is widely believed to have been the result of Defendant Ross encouraging such discussion and testimonials from his customers and potential customers, whom he would favor if they provided him with favorable word-of-mouth, occasionally compensating them with free products or increased standing in the Speed Seduction community.

20. USENET's purpose is decidedly noncommercial; most groups ban commercial promotion outright. In the case of ASF, the group was created as a means of diverting SPAM for Speed Seduction from other USENET groups. Despite this, the ASF group is open to anyone to post messages to it. Despite this, Defendant Ross has, in the past, held the position that ASF was "his" USENET group, going so far in 2000 as to claim that discussions of other methods were "off topic" and reportable to user ISPs. Defendant Ross actively encouraged his followers to enforce these alleged "violations," and caused several individuals, including Plaintiff, to lose internet accounts through this "enforcement."

21. Defendant LTSC is an "affiliate" of Speed Seduction, and sells its products through the LTSC website, for which it receives a percentage/commission of each item sold via its referral "tracking" links. A tracking link for the Speed Seduction website has been on the LTSC website since 2001 or 2002.

22.   In or around 1999 or 2000, Defendant Formhandle contested Defendant Ross's "authority" on ASF by publishing his own "ASF FAQ." They squabbled for the better part of a year or two before formally agreeing to divide the ASF "turf" among themselves through the creation, in the fall of 2001, of a new "ASF FAQ" document, which under USENET protocol, serves as the "official" rules of etiquette for a newsgroup.  Normally, a FAQ document on USENET addresses noncommercial issues, such as what is on-topic for the group.  The ASF FAQ, however, ventures into commercial issues by listing Defendant Ross's and the LTSC websites as being formally affiliated with the group, and thus carrying special privileges within the group.

23.   The current version of the ASF FAQ directs users to the LTSC website, advises users to read its "killfilter list" (of people whose posts to "filter" and not even read), and repeatedly imputes to third parties that Plaintiff is a "newsloon" who is disruptive to ASF, singlehandedly responsible for its downfall, and that the LTSC website, which Defendant Formhandle refers to as "moderated ASF" (mASF), was created specifically as a "solution" to the "problem" created by Plaintiff, who is listed multiple times on the "master killfilter list" for people who want to program their newsreader to avoid his postings.  The list contains many advanced computer-code text strings created by Defendant Formhandle.

24.   Through their agreement, Defendants LTSC/Formhandle and Ross was able to effectively relocate a large number of ASF "regulars" to the LTSC website, where Plaintiff has never been allowed to post messages.  This enabled Defendant Ross to create a message-board forum in which he was (but no longer is) its primary sponsor, and to have a place where he could market his products without having to concern himself with dissent or competition from Plaintiff and others similarly situated.

25.  At or around the same time the LTSC message boards and ASF FAQ were created, Defendant Ross entered into an agreement with Defendant Geiger whereby Defendant Geiger would host a hate website known as "RayFAQ" at http://www.ray-gordon.com.  This website, entitled *The OFFICIAL Ray Gordon FAQ: A Document About Gordon Roy Parker*, was created for the purpose of systematically defaming, disparaging, and attempting to extort/intimidate Plaintiff into ceasing his posting activities on ASF.  Defendant Geiger had hosted/published previous "hate sites" concerning Plaintiff, and updated the RayFAQ to tailor it to the ASF and USENET audiences when it was first republished on December 30, 2001.

26.  Shortly after its initial publication, Plaintiff was logging the contents of the RayFAQ website for evidence, and noticed that one of the site's internal hyperlinks pointed not to the website, but to a local directory on the author's computer entitled "g:\ssers\."  Speed Seducers are often referred to by shorthand as "SSers."  This indicates that the website was created at the behest of Ross Jeffries or his followers.

27.  Defendant Ross's propensity for acting as an internet ringleader has recently come to light in a spectacular way, thanks mostly to postings made by "Bishop" (a Doe in <u>Parker v. Wintermute</u>).  "Bishop" is a man named Michael Lee Emery, a former student of Speed Seduction who later became a speaker at Defendant Ross's seminars, and who sold a product called "Bishop's Journal" through the Speed Seduction website.  He now operates out of the domain http://www.new-alpha.com, and has released or is about to release new seduction material for sale.

28.  At the time of his postings, Bishop was acting as if he were merely a loyal follower of Defendant Ross.  Since they have parted ways acrimoniously, however, he has spoken much more freely of what actually transpired.  The following quotes are taken from the URL at

http://www.thundercatseductionlair.com/2005/05/bishop_reveals_.html, a "seduction blog" run by former SS student "Thundercat," who has also divested from Defendant Ross. The author of each statement below appears afterwards:

       a.    "[Defendant Ross] said one day that *[he] might ask me to fire a bullet for [him].* (Bishop)

       b.    "[Defendant Ross] isolated David D's then girlfriend, hypnotized her, unbuttoned her pants, and fingered her while David DeAngelo, his then student and "friend," was in the next room."[2] (Bishop).

       c.    "I have known for a loooooong time what kind of person [Defendant Ross] is, and few people believed me when I first started warning others on this site to be careful of him and his teachings. Many of his SS Cult members still troll this board trying to make fun of me and discredit me by calling me a "virgin" or "fat" or a "fraud," (none of which is true, by the way... well, maybe the fat part =) because I dare to call out their beloved "guru" on his actions." (Thundercat).[3]

       d.    "I took him from a nothing who hadn't been laid in years to someone who, by his own confession to me, had made his wildest fantasies came true...gave him an opportunity to establish himself as someone in a community that looked up to him...offered him a market to make some money on his product...stood by him, bailed him out of prison, and then forgave a $3000 debt." (Defendant Ross).

    29.   In the same Blog, Bishop has alluded to keeping a journal of his interactions with Defendant Ross, and has stated that what he has revealed is merely the "tip of the iceberg." In

---

[2] David D. is David DeAngelo a/k/a Eben Pagan, the author of "Double Your Dating," an LTSC affiliate, and a former student of Speed Seduction.
[3] It should be noted that Thundercat was also a Seduction Mafia operative at one point, linking to the RayFAQ website from his blog. His post here is typical of what happens when people leave the "SS cult" as he calls it.

paragraph 28 above we have Bishop stating that Defendant Ross once said to him that he "might ask him to fire a bullet," and further revealing that Defendant Ross had compensated him financially for his "work" (which included threatening Plaintiff), despite his denials at the time that this was the case. This is also a common tactic of Defendant Ross's.

30.    In Parker v. Wintermute, Plaintiff had named Bishop as a Doe, because Bishop had repeatedly threatened to harm Plaintiff through the use of "government connections" (a common threatening tactic which is routinely taught to users of NLP), and explicitly told Plaintiff that the only way to prevent this was to stop "bashing my guru [Defendant Ross]" and to cease posting to ASF. Discovery in that case revealed that the AOL account from which Bishop had posted his threatening messages was registered to a woman named Renee Ross, of California, who was Bishop's ex-girlfriend. By the time she was subpoenaed, Ms. Ross had successfully pressed charges against Bishop for trespassing in her home, where he was found with broken glass in his pocket. Bishop had just been released from prison when Ms. Ross received her subpoena, and Ms. Ross told Plaintiff that she did not know how to locate him, while also explaining to him that they had lived together for over a year and that his AOL usernames belonged to her account.[4]

31.    Defendant Ross has no shortage of followers, and would-be followers who lack the money to purchase his products. One such would-be follower was Wintermute, who graduated from the University of Pennsylvania in May, 2004. As a means of "paying his dues" to Ross, Wintermute began defaming Plaintiff on or around July 24, 2001, and made threats of violence against him on September 11-12, 2001 by stating in one USENET message that he might

---

[4] In his discussions with Ms. Ross about her relationship with Bishop, she confirmed that he was living with her during the period of time he was supposedly having sex with 80 women (the basis for *Bishop's Journal*, a document many have accused of being a fabrication), and that during that time, she said he was "home every night" and knew of only one other woman that he had slept with. If Bishop indeed had sex with 80 women during that time, he would had to have had "quickies" that did not require overnight travel, and which did not occur where he was living at the time.

"disguise himself as a Fedex driver" and attack Plaintiff in his home. Plaintiff reported Wintermute's postings to the Department of Public Safety at Penn, and the case was assigned to detective James B. Blackmore.

32.  Detective Blackmore initially told Plaintiff that he had spoken to Wintermute and warned him to cease and desist, and that Wintermute had agreed to do this. On September 15, 2001, Wintermute posted to ASF, a message confirming that he was "instructed not to speak to [Plaintiff].

33.  At first, however, Detective Blackmore had become extremely confrontational with Plaintiff, telling him that he was receiving, via e-mail, copies of messages allegedly posted by Plaintiff which he thought were criminal in nature, and his general tone indicated that he felt he "had something" on Plaintiff. Only after Plaintiff explained to Detective Blackmore, several times, that the messages were not posted by Plaintiff but instead by others who were falsely attributing statements to Plaintiff, did he realize his error.

34.  In addition to Wintermute, many members of Defendant Ross's "SS community" have taken to posting to ASF, alternately defaming, harassing, and threatening Plaintiff while, in the same postings or other postings, singing the praises of Defendant Ross and/or Speed Seduction. Several of these Seduction Mafia operatives have been doing this for years, while others come and go (if one person does it for too long it becomes too obvious and they lose credibility). The RICO case statement will outline each posting, but to keep this Complaint concise, Plaintiff will post a summary:

a.  **Player88** is an internet user of Hawk Communications, in Georgia. He is believed to be a man named James King, who lives in North Carolina. The only reason this harassment stopped was that SuperNews revealed to Plaintiff, in response to an abuse complaint,

that Player88 was a Hawk user, and he realized that he could be identified. When posting as

himself, James King would deride Plaintiff and occasionally cross the line into defamation (he

also has threatened to "flyer" Plaintiff's neighborhood in an attempt to incite others against him.

As Player88, he repeatedly threatened Plaintiff repeatedly with death during October and

November 2004, including claims, made in statements posted to ASF during that time, that:

          1)    He had knocked on Plaintiff's door while carrying a "real sickle" and

dressed in a Grim Reaper outfit;

          2)    "I'll be moving into the Fairfax December 1. I believe that's 30 days away."

          3)    Telling Plaintiff to "say hi to [his] mother and brother for [him]" (they live

with Plaintiff);

          4)    Asking (concerning Plaintiff): "I wonder if a person soaked in premium

gasoline burns hotter and longer than a person soaked in regular."[5]

          5)    "It's always just around the corner. Like I will soon be."

      b.    **Akaufmann@nyc.rr.com** was Doe #3 in <u>Parker v. LTSC</u> (E.D.Pa. #03-6936) is

believed to be Alex Kaufmann, of 445 Third Avenue, New York (he denied this but his Yahoo

profile and other evidence indicates that this is him). Mr. Kaufmann's relevant conduct, which

---

[5] The remainder of the message reads as follows: "Probably hotter, but not longer. But first. I'd remove the person's teeth one at a time, but leave the nerve endings intact. Then I'd pour boiling coffee (decaf so the person wouldn't shake) over the gummy nerve endings, then I'd pour ice water over the sensitive nerves, causing intense contrasting pain (with enough relief to make the following pain feel that much worse.) Then I'd pull out the nerve endings one by one using microscopic tweezers. No anesthesia, of course. But I would paralyze the vocal cords so no screaming could take place. Just suffering ...I'd perform liposuction on the overweight person's body and then force them to eat French fries cooked in their own fat. Anything thrown up would be refed until it was digested. Then I'd give the person two paper cuts ... one on each eyeball. I'd administer an overdose of sleeping pills and modafinil so they'd want to fall asleep but couldn't. They'd feel their heartbeat slow down. Then I'd speed it up with Bronkaid (legally available ephedrine). Then I'd use hypnosis to intensify the pain in the same way that Darth Vader would torture Princess Leia in the NPR version of Star Wars. Then I'd soak their bodies in 37% salicylic acid until the skin begins to flake off like a leper. Then I'd read some Vogon poetry and blast them with the Shoe Intensifier Ray. Resistance is useless! Resistance is useless! Then I'd bathe them in 93 octane gasoline and then take a smoke break, but forgetting my lighter, I'd have to use flint and steel to make sparks to create a fire. *poof* The flaked skin will burn faster and hotter than unflaked skin."

includes defamation, links to the RayFAQ, and attempts to threaten Plaintiff's mother economically, is summarized here as follows:

1)    Posting links to the RayFAQ website on January 26 and 27, 2004, and endorsing the content of the site while advising users to visit the site for "information concerning Plaintiff," as well as deliberately reposting anonymous links to the RayFAQ in his replies, so as to ensure that they are archived (such as on March 3, 2004).

2)    Repeatedly imputing severe mental illness upon Plaintiff, to the point where "Dr. Kaufmann" concludes, whenever Plaintiff's views don't agree with his own, that this is evidence of an impaired mental state. For example, Mr. Kaufmann had made a statement that "Too bad Gordon's mental illness prevents him from appreciating the irony." In response to that statement, Plaintiff said "don't quit your day job," and in response to *that* statement, "Dr. Kaufmann" replied that his "day job is related to psychology," thus making the claim that his opinion is somehow beyond that of a layperson's. (02/16/2004).

3)    Repeatedly promoting the LTSC website in a manner that even someone who was paid to do so would take pride in as a good job, such as telling a "newbie" that "There is no useful information here. It's all gone to mASF." (02/09/2004). http://www.fastseduction.com/discussion."

4)    Accusing Plaintiff of being "someone known to use racist sock-puppets" (other usernames). (01/26/2003).

5)    "Who lent Gordon money? Wonder if Mommy had to co-sign and whether that leads to liability in counter-suits." (01/19/2004).

6)    "Once again, Gordon shows he understands NOTHING of AOL's TOS or the difference between an on-topic URL and an off-topic one full of porn spam." (12/19/2003).[6]

7)    "Given Gordon's self-professed bipolar illness and his high volume of middle-of-the-night postings, it would appear that a manic phase is upon us again." (10/30/03).

8)    "Me, I'm looking forward to the housewarming party. (11/17/04). This message was posted in response to Player88's claim that he was moving into Plaintiff's building.

9)    "Why, I do believe Gordon has discovered the Ponzi scheme." (11/22/04).

10)    "Gordon was banned from [The LTSC website] from Day 1. His 9/11 tantrums and history of disruption, off-topic posting, flaming and threats of legal action made apparent the need for a moderated forum." (02/01/05).[7]

11)    "Gordon is suing based on alleged damage to his alleged business. Those defendants he actually gets into court can show his writings as an alternate theory for why he can't sell his crap." (03/24/05).

12)    "Gordon's mental illness and narcissism will not let him believe he is less than important to other people." (04/04/05).

c.    **Aardvark9084@insightbb.com**, a self-admitted Speed Seducer and follower of Ross's, has been the most active operative in recent times.  His postings run the gamut from defamation to attempts to use discovery to intimidate Plaintiff into not suing him.  Following is a sampling of some of his more vitriolic statements:

---

[6] This posting was made in response to a claim by Plaintiff that the "SPAM" rules should be enforced equally. Citing the ASF FAQ, Mr. Kaufmann claimed that Plaintiff linking to his seduction (not porn) website was SPAM, while links to the LTSC website were not.
[7] Mr. Kaufmann is either showing reckless disregard for the truth here or making a statement which demonstrates that Defendants Formhandle/LTSC have communicated this to him.  Indeed, the LTSC website has a policy of not judging users based on their conduct away from that site.

1)   "his mom would likely throw him out and he'd have to get a job and work for his keep if she knew what kind of criminal acts he's committed under her roof." (03/06/05).

2)   "ray is a fugitive from justice who forgets that that will be very likely brought up at any of his future court jesterings." (03/08/05).

3)   "i wonder what kind of dirt the pennsylvania bar association has on ray or could have." (03/11/05).

4)   "isn't it illegal to falsely portray oneself as a lawyer?." (03/27/05).

5)   "the frauds of his works, especially his "sexy hypnosis" tapes. which are nothing more than ray disguising his own voice with a digitizer to sound like a woman." (04/02/05).[8]

6)   "you need to be put away. a mental institution or jail *without the benefits of an internet connection* for you, will do just fine." (04/12/05). (Emp. Added).

7)   "you are not fit to comment on anyone who is employed because you are 100% unemployable." (04/18/05).

8)   "you won't provide proof that you've ever worked an honest day's labor in your miserable life... have you told your mommy of the numerous crimes you have committed and continue to commit under her roof?" (04/18/05).

9)   "when you end up face down in a pool of your own blood and manure, you'll eventually get the hint. stop using personal information to harass and torture others." (06/02/05).

---

[8] This post refers to the "Hellen" hypnosis tapes produced by Plaintiff. Aardvark is stating that he believes they were recorded by Plaintiff using a digitizer rather than the actress he hired.

10)  "this helen and her handbasket are nothing more than a marketing ploy of ray's. she does not exist other than as a mechanical device that feminizes ray's own voice for the "tapes".(03/19/04).

11)  *"you are not worthy enough to be allowed to lick the mud off ross jeffries' shoes.* what makes you think that you are fit to compare yourself to him in any way?" (03/19/04) (Emphasis Added).

12)  "i said that *speed seduction* does not work on women that are drunk or on drugs. since you are just another of the hundreds of sock puppets of ray gordon you know that much." (04/07/04).[9]

13)  "this is as transparent as your already uncovered "helen". that's right. as i predicted helen was nothing more than *you* using a voice digitizer to duplicate a female voice for your "sexy hypnosis recordings".  what a scam!" (04/13/04).

14)  "you are not fit to even mention [Defendant Ross's] name. you're not even worthy enough to empty his cat's litterbox." (04/13/04).

15)  "remember, ray, you're the felon that i don't respect." (06/19/04).

16)  "everything about you is a scam. your "helen, sexy hypnosis" tapes are actually *you* using voice digitizer to make you sound female. nobody is buying those either." (06/27/04).

17)  "he has criminally tresspassed (a federal offense) into websites and forums…. ray gordon or gordon roy parker or whatever he wants to call himself belongs in jail for his crimes. i told him that *as a member of the media* i would hold him accountable for his actions and call him on the carpet whenever he makes a statement." (07/24/04). (Emp. Add).

---

[9] This message was posted in response to an internet user named "JimSummers" who was critical of Speed Seduction.  Aardvark attacked him thinking that it was Plaintiff disguising his identity, when it was not.

18)  "i just want him to know that he's facing prison time, time away from usenet and instead his gross shell of a body in the clutches of equally evil men who won't put up with his games. men who look to stretch the anus of a punk like him." (07/25/04).

19)  "you ripped off [Plaintiff's first book] from ross jeffries." (08/27/04)

20)  "our best bet is to help google.[10] let them know that as long as the baron of barratry has a computer and hasn't been declared "incompetent" he will keep up appeals until his brain tumor eats his spinal cord on the way down." (11/09/04).

21)  On July 25, 2004, Aardvark posted to ASF, a message in which he claimed to have sent the following letter (in response to a request by "Editorial Staff," another operative believed to be Defendant Geiger), to numerous parties in Pennsylvania, *including this court* in which he stated the following:

> this was forwarded to all the email addresses provided in the original plea for help. courts, sheriffs office, dist atty, etc. they all got it. my grandpa always said that if you sling enough shit, some of it's bound to stick somewhere. lets just see where some of this sticks, shall we?
>
> Gordon Roy Parker/4247 Locust Street, #806/Philadelphia, PA 19104/ (215) 386-7366
>
> The above individual (AKA Ray Gordon) has publicly admitted to the crimes of "hijacking" a website and replacing the information with false information in an effort to have the site shut down. He has also been engaging in threatening Internet Service Providers into giving up information on their clients by falsely claiming, over the phone, to be a bar certified lawyer in an attempt to coerce said providers into bowing to his will. Mr. Parker has also been caught reposting information to a usenet newsgroup(s) obtained from a website and message forum that Parker was forbidden from accessing due to his behavior. Even after being warned to cease and desist from such behavior, Parker kept "hacking into the site, using alternative aliases to hide his identity.
>
> He has engaged in outright barratry and threats of lawsuits to silence his critics who only wish for Parker to refrain from illicit or discourteous behavior. He has libeled users of the usenet group with terms such as "hypno-rapist" and "mind rapist". Parker has wished death upon the children of his detractors. This individual is a danger to the public at large and a man admittedly enjoying what he perceives to be an "immunity" from punishment for his acts bragging about being such

---

[10] Plaintiff has filed suit against Google in this court.

engaged in criminal activities on a regular basis. *It is my sincere hope that you would be able to assist with the apprehension and seclusion from decent society of Mr. Gordon Roy Parker, be it in a jail or perhaps a mental institution should it be deemed fitting if Parker is declared incompetent.* (Emphasis Added).

I would be happy to provide my name you you upon request should it be absolutely necessary on the condition that such private information about myself is not made available to Parker for his misuse and further criminal mischief making. I hesitate to give it now as I simply do not wish for Mr. Parker to see it attached to theis message as he is often engaged in the merciless harassment of his perceived "enemies" once he has their personal information in hand. Parker has been known to also masquerade as a bar certified attorney to threaten and harass the families of his said "enemies". Thank you in advance for your attention to this matter.

35.    Aardvark's conduct is typical of how Defendant Ross operates: he delegates the "dirtywork" to other Seduction Mafia operatives while appearing to take the high road for himself.  He does this because Aardvark (and other operatives) are more or less "judgment proof" and (he believes) willing to take the fall for him.  He also does it because by rotating operatives, none become "stale" and it gives the appearance of support within the newsgroup. This is standard operating procedure for what many call the "SS Cult."

36.    Plaintiff avers that Wintermute, Alex Kaufmann, Player88, James King (believed to be Player88), and Aardvark each conspired individually with Defendant Ross to post the above messages to ASF, or alternatively, were given general instructions by Defendant Ross to engage in conduct of this nature, in furtherance of the Seduction Mafia.

37.    Defendant Ross did not delegate all of the Seduction Mafia dirtywork to the operatives, however.  Sometimes he would post statements himself which themselves were actionable.  These statements let it be known to his followers that Defendant Ross considered Plaintiff "fair game" for the "Black PR" campaign outlined above.[11]  Following is a summary of the statements relevant to this action:

---

[11] "Black PR" is a well-known Scientology tactic which the "church" uses to silence dissent.  Defendant Ross is believed to have ties to Scientology, and in fact a character in the movie "Magnolia" (played by Tom Cruise) was based on his work.  The producers of Magnolia, along with Mr. Cruise, are scientologists.

a.    "If you are sued by Ray, IMMEDIATELY after filing your answer, begin propounding discovery, first and foremost requesting any and all documents supporting his assertions that his business has been damaged.  Enjoy the show as he squirms and avoids and gets hit with sanctions and fines by the court.  Move for a psychiatric examination IMMEDIATELY.  Watch him squirm." (03/24/2004).

b.    "Sue RAY NOW!  Ask me how!  PUT AN END TO HARASSMENT AND ABUSE OF PROCESS!" (multiple posts including 03/25/2004);

c.    "Ray...where do you get the time during the day to make these zillions of posts?  TAKE YOUR MEDS!" (03/25/2004);

d.    "Ray is a nut job and a sociopath," (07/25/2004).

38.    Plaintiff avers that, for each statement in paragraph 37 above, that at the time of publication, Defendant Ross and the publisher of each of the following statements that were not his, either knew or should have known that the statements were false, and that:

a.    Plaintiff's "Hellen" recording was not made by Plaintiff digitizing his voice;

b.    Plaintiff has never impersonated an attorney;

c.    Plaintiff is not "facing prison time."

d.    Plaintiff did not plagiarize Ross Jeffries for his first book;

e.    Plaintiff has never criminally trespassed on any website or computer system;

f.    Plaintiff has not abused process and has never been found to have done so;

g.    Plaintiff is not a felon and has never even been arrested for any crime;

h.    Everything about Plaintiff's business is *not* a "scam'"

i.    Plaintiff is not "100 percent unemployable" and in fact works regularly;

j.    Plaintiff is not a fugitive from justice;

    h.    Plaintiff has never used "racist sock puppets" on USENET;

    i.    Plaintiff has never organized nor furthered any ponzi scheme.

39.   Plaintiff avers that the defamatory statements in paragraph 37 were made intentionally, and for the purposes of causing harm to Plaintiff's reputation and to cause pecuniary harm to his business

40.   Plaintiff avers that the following statements were made for the purpose of using fear and coercion to obtain property from Plaintiff in the form of business revenue, investment revenue, and goodwill, for the benefit of the Seduction Mafia:

    a.    Defendant Ross's encouragement to others to "sue ray NOW!" and to abuse process through discovery in the event that they are sued by Plaintiff.

    b.    Alex Kauffman's interest in Player88's "housewarming party."

    c.    Aardvark's letter to the judiciary and law enforcement in Philadelphia, with its multitude of defamatory statements and allegations.

    d.    All of Player88's threats as outlined, including the threats to kill Plaintiff and to move into his building for the purpose of harassing and stalking him.

## Averments Specific To Defendant Geiger

41.   Defendant Thom E. Geiger is a man who has been "hounding" Plaintiff on USENET and through the web for seven years now. He began in April 1998, when he was recruited by the "Gymnastics Mafia"[12] to harass, threaten and defame Plaintiff in response to his whistleblowing regarding child abuse in gymnastics in general, and against former Olympic gymnast Dominique Moceanu.

42.   After it was revealed that there was in fact child abuse in gymnastics, and Ms. Moceanu ran away from home in 1998, Defendant Geiger continued to post about Plaintiff, but

---

[12] This group actually registered a website at http://www.gymn-mafia.net.

generally lacked a purpose for doing so until the Seduction Mafia was formed.  He had briefly registered a domain with cracked.com in 2000, where he was attempting to convince people that someone named "Ray Gordon" (allegedly an IT executive from Virginia) felt the need to "clear his name" and the site repeatedly defamed Plaintiff, while threatening legal action against him for "tarnishing the Ray Gordon name."  The abuse technician at Cracked.com informed Plaintiff that the site was registered to Defendant Geiger, at which point he removed it.

43.   In late 2001, and in agreement with Defendant Ross, with the agreement and/or approval of Defendants Formhandle/LTSC, Defendant Geiger registered the ray-gordon.com domain which would eventually become the host of the RayFAQ.  Initially, he had listed a fictitious name and address for the registration, but changed it to his own name when Plaintiff complained to his registrar pursuant to ICANN rules which prohibit such cloaking.

44.   Defendant Geiger is extremely well-versed in the internet technology, and how to exploit it for purposes such as those alleged in this lawsuit.  In 1998, he would post under several different "sock puppet" names, often using the names of military or government figures, and at one point was threatening Plaintiff with violence from an account he used to have at alt.net (Altopia Corporation, in Seattle), in which he used the alias "SubZer0."  Only when he learned that his postings were being preserved by Altopia for retrieval via subpoena did he begin resorting to other means of posting.

45.   Defendant Geiger's role in the Seduction Mafia was simple: conduct as strong a "Black PR" campaign as possible against Plaintiff, through the publication of the RayFAQ (either as the actual publisher or by deliberately cloaking the publisher's identity while claiming §230 immunity for himself), and to publish, arrange for the publication of, or encourage third parties to publish messages to ASF, USENET, and the web where they would link to the

RayFAQ website, with the idea of allowing them to claim third-party immunity under §230, and that so no permanent record of the content of the RayFAQ would appear in the postings (this way the site could be removed and all that is left is a link to it).

46.   The "RayFAQ" website was continuously published to the web and updated continuously until it was removed via a DMCA notice by Plaintiff to Verio (its backbone provider).  Prior to its home at ray-gordon.com, the RayFAQ website had been published on a free webhost located at http://www.odinsrage.com, a white-supremacist website.  It was removed from that "free speech website" because of the undue attention it was attracting to the white supremacists.  It included the following statements concerning Plaintiff:

a.   Statements encouraging third parties to contact Pennsylvania-based media, law enforcement agencies at all levels to "warn" them about Plaintiff, the Commonwealth's attorney general, and various mental health agencies in Philadelphia.  Relevant pages from the RayFAQ website and which were located on the server included http://www.ray-gordon.com/addr1.htm, addr2.htm (all locations hereinafter referenced will have the domain prefix omitted), addr3.htm, and addr4.htm.

b.   Statements encouraging third parties to "contact the police and express your concerns" (from the help.htm page), to ask "child abuse organizations" to help (with a link to a "sexual assault information page – also on help.htm),

c.   Statements (from help.htm) encouraging third parties to "contact a mental health agency in Philadelphia."   Also in this paragraph is the following:

> "Keep in mind that Ray can be extremely persuasive, and has been known to talk his way out of an intervention. *The Mental Health agencies in Philadelphia are well aware of who Ray is*, and do have knowledge of his internet habits. They are a contact that should not be taken advantage of,"

      d.    Statements encouraging users to assist the Seduction Mafia, including the

following from help.htm:

> ***We believe that there is strength in numbers,*** and you may be sure that any solid front
> of resistance to Ray's unending harassment, continued threats, and viciousness will be
> successful in preventing Ray from harassing people further. We have noted a pattern
> developing. When Ray is met with truthful, strong, and forceful resistance, he folds.
> Refer everyone to this website, contact AOL, and the other resources found on this site.

      e.    A statement of purpose which offers a motive for the RayFAQ:

> Let us clearly state FOR THE RECORD that we do NOT "hate" Ray. We feel pity for
> Ray. We feel sorry for Ray. We feel that Ray has a deep-seated problem of some sort,
> which makes it difficult for him to take responsibility for his actions and words. This site
> does NOT exist to "attack" Ray. It exists to serve as an independent record of posts that
> cannot be removed, and to make  parody of a PUBLIC FIGURE. We hope that Ray
> comes to realize that we care about his mental and emotional state, and we sincerely
> hope he seeks the help we believe he needs. (Emphasis Original) (from index0.html).

      f.    The lawsays.htm page of the RayFAQ encourages operatives of the Seduction

Mafia to report Plaintiff to the police, and implies that law enforcement has a negative opinion of

Plaintiff which it freely shares with the public:

> The problem with it is, ***Law Enforcement sees Ray as laughable, mentally deficient, and***
> ***psychologically unstable,*** so they haven't quite had enough impetus to actually do something
> about him. Ray likes to claim that the police aren't doing anything because if it were illegal what
> he were doing, the police would have to do something. ***Perhaps if more people visited the Police***
> ***Addresses section of the page, and complained to Law Enforcement in Philadelphia, then they***
> ***would have a big enough file to finally take some action.***

      g.    Also on the lawsays.htm page is a claim that, during the time in controversy,

Plaintiff was "running a bookmaking operation" in Pennsylvania, as well as a claim that there is

"no such thing as civil RICO."

      h.    The links.html page of the RayFAQ contains the following statements

concerning Plaintiff, with "relevant" links:

| Pennsylvania Statutes, Annotated |
| :---: |
| Title 50. Mental Health Chapter 15. Mental Health Procedures |
| **http://www.psychlaws.org/LegalResources/StateLaws/Pennsylvaniastatute.htm** |
| Of particular note: |
| § 7301. Persons who may be subject to involuntary emergency examination and treatment |
| Analysis of Pennsylvania's Assisted Treatment Laws: |

| http://www.psychlaws.org/LegalResources/StateLaws/AnalysisPennsylvania.htm |
| --- |
| Fact Sheet: Manic-Depressive Disorder (also known as bipolar disorder) http://www.psychlaws.org/GeneralResources/Fact6.htm |
| Information on Narcissistic-Aggressive Personality Type http://narcissism.homestead.com/natype.html |

i.    The ngreply.htm page of the RayFAQ encourages operatives of the Geiger

enterprise to respond to any and all newsgroup postings by Plaintiff with a message "warning"

others that Plaintiff is "disruptive" to the newsgroup, and imputing upon him "plagiarism of

respected academic authorities," and linking USENET readers to the RayFAQ website. This

"reply" has been copied by many operatives in furtherance of the enterprise, and was published

in this or other forms to USENET at least several hundred times during the times relevant to this

action.

47.    The statement in the RayFAQ that *we believe there is strength in numbers* belies the

Seduction Mafia conspiracy. Defendant Geiger and his operatives actively sought assistance

from any and all third parties to further the enterprise's mission of destroying Plaintiff's life.

48.    Plaintiff avers that the request for third parties to contact the many entities listed on

the RayFAQ site (law enforcement, mental health agencies, the courts, etc.) were made with the

intention of interfering with Plaintiff's business, his personal life, and any contracts or economic

dealings related thereto (such as book sales, employment, and potential investment revenue), his

living arrangements (a verbal contract), and to induce third parties to interfere with the quiet

enjoyment of his everyday life to which he is entitled.

49.    Plaintiff avers that Defendant Geiger has deliberately made use of internet search-

engine technology to ensure that whatever is said about Plaintiff will be the first thing anyone he

meets discovers about him by performing a search on his name, his business, or even his

products or family members' names. Defendant Geiger accomplished this through the use of

Plaintiff's full legal name in the RayFAQ, and in internet postings he either made himself or directed other operatives to make.

50.    In Parker v. LTSC, in his Motion To Dismiss, Defendant Geiger claimed that he had registered the ray-gordon.com domain name long before he used it to publish the RayFAQ, and in fact stated that he had done so because he was a fan of the 1960s Georgia State wrestling champion, Ray Gordon.  He then claimed that he was contacted about hosting the RayFAQ, and only then did he agree to do so, and that he had no previous knowledge of or connection to the Seduction Mafia or its principals.

51.    Defendant Geiger has taken great pleasure in exploiting the judiciary's general ignorance regarding the internet, and has counted on the courts to rush to judgment on several counts, such as it being a) "just an internet flamewar"; b) that he is a detached, innocent party who was not actively involved in any conspiracy with the other defendants; c) that Plaintiff is a pro-se and as such files lawsuits such as this one on a whim; and d) that the sheer number of defendants will allow for a defense claim that the complaint is too voluminous, leaving Plaintiff with the choice of partial prosecution or dismissal for failure to pled with concision.  Defendant Geiger is well aware of the general misconceptions held by those who do not "live" on the internet, and plays them to his advantage at every turn.

52.    Since Parker v. LTSC was filed (and later dismissed), Defendant Geiger has replaced the RayFAQ on the ray-gordon.com website with a redirection to another site he hosts, at http://www.chewonthis.org.   On that site (http://chewonthis.org/lawsuit1.htm), he explains his position regarding and experiences with the previous lawsuit.  The site, whose content reflects updates through at least August 25, 2004, contains the following statements concerning Plaintiff and which are otherwise relevant to this action:

a.    "Some time back I agreed to point a domain name I had registered years ago to a website that was, from the evidence I have seen in a federal case against me, created to bring attention to the nasty and (in my personal opinion), dangerous internet activities of a seriously sick individual."

b.    "The name Ray Gordon is NOT this moron's real name. The problem child, the internet newsloon involved in this, uses the name Ray Gordon on internet newsgroups and claims to be an author of adult type seduction book."[13]

c.    "When the Ray-Gordon.com website went up, the newsloon accused me of being the author of the site. That has been a lie from the start and the newsloon knows I'm not the author. He sued the author of the site in the same suit where I'm being sued, but the author was dismissed from the suit (along with all but two of the original 100 defendants...myself and a company the newsloon considers a business rival), because the newsloon is too stupid to properly serve the rest of the defendants with summonses. You should really go and read the text of the lawsuit if you want a good laugh."

d.    "What's actually going on is this wicked, demented, fat little ogre spews hate in dozens of internet newsgroups, hoping someone will react to his crap and give him a reason to sue them in court."[14]

e.    "Apparently, the moron has decided to stop trying to get me to name the person I loaned the ray-gordon.com domain name to (something I can't tell him because I don't know who it was. All I have is the same email address this wacko already knows), and now he's decided to

---

[13] Plaintiff has been using the name "Ray Gordon" since 1996. He had no knowledge of the "other" Ray Gordon, and his use of the Ray Gordon name is derived from his own name (which should be obvious).

[14] This is not the case at all. Defendant Geiger is attempting to blame Plaintiff for the reality created by 47 USC §230, which has resulted in ISPs believing, and courts to date affirming, a near-blanket immunity for what their users do. Because they do not terminate user accounts even in egregious situations, and instead advise users to "go to court," Plaintiff is left with no alternative but to tolerate defamation which is then internationally archived for anyone to search.

lie under penalty of perjury and try to assert that I created the website I directed the domain name to, even though he knows full well I'm not that person, and I know I can prove he knows that fact in court."

53.  Defendant Geiger is attempting a maneuver here whereby he is claiming to be someone who was uninvolved and disinterested in the Seduction Mafia, when in fact he was one of its principals.  In paragraph 52(a), he endorses the co-Defendants from Parker v. LTSC, using similar epithets to "flame" him, and is implying that he has only recently formed this opinion, when in fact, Defendant Geiger has been singlehandedly making posts concerning Plaintiff, including threatening posts, as far back as 1998.  Rather than Plaintiff "laying in wait" for people to sue, Defendant Geiger instead laid in wait for an excuse to join the fray under the pretext of being a previously disinterested "newcomer" unjustly dragged into this action, when in reality he has played a visibly active role in hosting the RayFAQ, a role that would have any webhost or ISP expecting to be named in a lawsuit under similar circumstances.

54.  Defendant Geiger's claim that Plaintiff "knew he was not the author of the [RayFAQ] website" is incorrect.  Plaintiff had no such knowledge, and all evidence he has uncovered has pointed to Defendant Geiger as the sole publisher.  "The author" of the site was named as Doe #8, separate from Defendant Geiger, in the event that this averment was somehow incorrect. This in no way equates to Plaintiff not having a firm belief that the RayFAQ author was in fact Defendant Geiger.  He was listed as the sole technical and administrative contact for the domain, which meant that he had exclusive control over who could access it.  To any extent he is not the author of the site, he is ultimately legally responsible for its publication.  For this court to find otherwise would allow any domain owner to claim anonymous authorship of a site on their domain and completely escape liability as Defendant Geiger attempted to do in Parker v. LTSC.

55.   At the time of publication, Defendant Geiger either knew or should have known that

Plaintiff did not "lie under penalty of perjury" in <u>Parker v. LTSC</u> when he claimed that

Defendant Geiger created the RayFAQ website.  Plaintiff ***averred*** this based on the evidence.

Defendant Geiger did not refute Plaintiff's averment under oath, did not testify, and did not

submit an affidavit which stated, under penalty of perjury, that he did not publish the site and/or

did not know who did.  Instead, he claimed that he had registered the domain for the purpose of

building a tribute site for a 1960s Georgia State Wrestling champion who happened to be named

"Ray Gordon."  Plaintiff further avers that Defendant Geiger's explanation passes neither the

"smell test" or even the "laugh test."

56.   Defendant Geiger's comments in paragraph 52(a) above are indicative that his interest

in the RayFAQ was far from passive; indeed, he explicitly endorses the content, and refers to

Plaintiff in a highly derogatory manner indicative of maliciousness, such as "moron,"

"newsloon," and "problem child."

### <u>Other Averments Specific To Defendant Geiger (re: "Anonymous" Postings)</u>

57.   USENET is set up so that users may post to it anonymously.  While anonymous

speech is supported by precedent in this country (albeit a tenuous one), anonymous speech on

USENET presents a unique difficulty in that its postings are archived on third-party websites and

search engines, all of whom claim §230 immunity, which makes it literally impossible for targets

of defamation and other conduct to seek redress.  In this case, Defendant Geiger is using his

unsupported claims of third-party authorship of his website to invoke this very immunity.

58.   Defendant Geiger's explicit and admitted conduct (i.e., registering the ray-gordon.com

domain and claiming that the actual author of the site is not known to him) is minor compared to

what it set the stage for: two users, who shall be referred to as Anon-1 and Anon-2, have been

flooding USENET for years with tends of thousands of defamatory, harassing, and threatening messages directed at Plaintiff. Many of these messages contain links to either the RayFAQ, the LTSC website, or both, and purport to "warn the public" about Plaintiff.

59.    Anon-1 is an anonymous ASF poster whose posts impute mental illness upon Plaintiff, and which contain a link to the LTSC website in its signature, a reference to it as the "official" or "main" ASF website. Following is a sampling of messages posted by Anon-1 to ASF during the relevant times in this action:

  a.    New visitors to alt.seduction.fast are welcomed and directed to the main website http://www.fastseduction.com Most seduction discussion has been relocated to the forums on this website, which are also known as mASF. These forums can be accessed through your news reader just like this newsgroup, or through a web interface. The forums were created as an alternative to the large amount of spamming, misinformation, and offensive behavior by a high-volume poster known to unfotunately suffer disabling mental illness, in the regular alt.seduction.fast newsgroup. As the forums require registration (which can be done through an anonymous email account), disruptive individuals are completely prevented from posting. This results in a much more useful and productive forum. Drop by and see for yourself.   For information on a particularly disruptive poster in the alt.seduction.fast newsgroup and his history of mental illness and harassing others, visit http://www.ray-gordon.com. (August 11, 2003).

  b.    Welcome CF! Please be aware that the vast majority of asf activity has moved to the forums on our official website at http://www.fastseduction.com If you sign up for an anonymous account then you can access the forums right through your newsreader, just like here. Otherwise you'll have to use the web interface. You'll find many other resources on the site also.   (September 22, 2003).

  c.    New visitors to alt.seduction.fast are welcomed and directed to the main website http://www.fastseduction.com. Most seduction discussion has been relocated to the forums on this website, which can be accessed through your news reader just like this newsgroup, or through a web interface. The forums were created as an alternative to the large amount of spamming, misinformation, and offensive behavior by a high-volume poster known to unfotunately suffer disabling mental illness, in the regular alt.seduction.fast newsgroup. As the forums require registration (which can be done through an anonymous email account), disruptive individuals are prevented from posting. This results in a much more useful and productive forum. For information on a particularly disruptive poster in alt.seduction.fast and his history of mental illness, visit http://www.ray-gordon.com. (November 21, 2003).

  d.    New visitors to alt.seduction.fast are welcomed and directed to the main website http://www.fastseduction.com.  Most seduction discussion has been relocated to the forums on this website, which can be accessed through your news reader just like this

newsgroup, or through a web interface. The forums were created as an alternative to the large amount of spamming, misinformation, and offensive behavior by a high-volume poster known to unfotunately suffer disabling mental illness, in the regular alt.seduction.fast newsgroup. (June 2, 2005).[15]

60.    Anon-2 has posted thousands of messages to ASF as "Editorial Staff," and has continued to link to an old, archived version of the RayFAQ to this day, while advising in his posting "signature" that the current RayFAQ was removed from its host and is no longer on the web.  Following is a sampling of messages posted by Anon-2 ("Editorial Staff") during the times in controversy in this action:

a.    "Freedom of Speech is WORTHLESS without Social Responsibility. The OFFICIAL Ray Gordon FAQ: http://www.ray-gordon.com. Everything you need to know about Usenet's biggest NewsLoon! (04/16/03).[16]

b.    "How many days does Gordon Roy have left now?" (04/25/03).[17]

c.    Yes, Gordon Roy made a DMCA Complaint. We have a copy of it. When he was asked to provide a legal affidavit of authorship and a formal DMCA request in compliance with the law, he failed to do so, so the site access was never in any jeopardy. This was right before the host put up their own page into our space by mistake. (Remember when everyone was posting that going to our URL took them to the Uncensored Hosting splash page? That's when this was.) In any case, our inbred idiot has just claimed responsibility for the Denial of Service attack, and also claimed to have taken action against our website, *in direct contravention of the ORDER of JUDGE James Mc Girr Kelly denying him his TRO to have the site removed. That is a crime.* We are therefore having the Pennsylvania State Police Computer Crimes Unit investigate this terrorist attack, and are also forwarding this post, and the supporting evidence to Judge Kelly's office for their file. In the event that Mr. Incompetent can ever find out who we really are, and *if he's stupid enough to ever try to get us into court, we will then move for him to be Baker Acted and committed to a psychiatric institution for his own (and our) protection.* (10/30/03).[18] (Emphasis Added).

d.    "There is one and only one reason why none of us have gone to Philadelphia to kick your scrawny, effeminate arse: You aren't worth the plane ticket. If you think you are,

---

[15] A Google search performed on June 3, 2005 for the term "unfotunately" for the ASF newsgroup returned 562 nearly identical results, with all postings made anonymously.

[16] This message was posted to rec.games.backgammon and entitled "The OFFICIAL Ray Gordon FAQ: An Invitation."

[17] This message was posted in response to a "countdown of [Plaintiff's] remaining days" that accompanied several death threats made against Plaintiff by Osgaldor Storm to USENET during April, 2003.  This post also contained the signature statement from a) above, which included a link to the RayFAQ.

[18] The TRO was denied not because of the merits, and not because this court recognized the site's right to exist, but rather because the TRO motion was filed ex-parte, and this court said that injunctive relief could be sought at a later time.  Plaintiff later filed a DMCA notice against Geiger and had the site successfully removed.  No orders of this court were disobeyed, no laws were broken, and no crimes were committed.

open that faggoty little mouth of yours again, trying to threaten us, and we will see who runs and hides. *We'll even call the cops for you, and make sure that the ambulance is there to patch up your injuries.*" (August 1, 2003).

    e.    Just wait. You're about to find out the cost of fooling with the wrong people. And the sweet part of it is, you won't even be able to see it coming. It will descend on you when you least expect it, from the most unlikely direction...Are you looking over your shoulder yet? Well, it won't do you any good. Hahahahahahahahahahahaha..." (08/11/03)

    f.    In addition to the above postings, a google search for "ray-gordon.com" and "Editorial Staff" for the group alt.seduction.fast returned *282 results*, indicating at least that many postings.

61.   Anon-2's posts were made primarily to link to the RayFAQ, although as the above indicates, sometimes defamation, bad legal opinions, or outright threats were part of the mix.

62.   Plaintiff avers that Defendant Geiger is Anon-1 and Anon-2. Alternatively, he avers that whether or not Defendant Geiger is either or both parties, that these individuals conspired with Defendant Geiger and the Seduction Mafia to publish and link to the RayFAQ as outlined above, and to concurrently promote the LTSC website, for the purpose of using intimidation, fear, and coercion to obtain property from Plaintiff in the form of business sales, advertising and investment revenue, and goodwill.

63.   Recently, Defendant Geiger began posting to USENET under his own name. Following is a summary of some, but not all, of his relevant statements:

    a.    In the course of the last lawsuit I was named in, the plaintiff didn't seem to grasp the concept that it wasn't whether the court understood the allegations being made, it was whether I, as a pro se defendant, was able to understand what claims and allegations were being made against me enough to allow me to mount an adequate defense. As a person of average intelligence, I must be afforded the opportunity to present the best possible defense I can, to refute any and all claims and allegations specified in a complaint. To do that requires a complaint specific and comprehensible enough that I can understand the exact claims being made. If I am named to another lawsuit by anyone at some future date, somewhere, for some reason, I will again represent myself as a pro se and the same requirement will apply. (03/20/05).[19]

---

[19] This message is in stark contrast to the extensive legal opining Defendant Geiger offered at chewonthis.org, his website about this lawsuit, where he quotes chapter and verse of many laws.

    b.    Are you addressing me? I don't think I am the only person reading this group who feels you are implying something about me specifically. If you are, please be specific about what it is you think I have done. If you're not trying to speak about me in some roundabout way, who are you referring to? (03/22/05).[20]

    c.    If you think you would like to accuse me of anything, particularly republishing something that violates either the law or your rights, we will see if that is true in a court of law. Given the link is to a message you posted, I'll guarantee I can file in my home state the moment you publicly accuse me of something illegal, and I will win. (05/25/05).

64.    In the messages cited in the previous paragraph, Defendant Geiger claims whichever level of legal knowledge suits his current agenda: to this court, he was an ignorant pro-se who registered a domain for another purpose and assigned it to someone in a manner in which was totally benign.  Then, to USENET, he claimed to be a pro-se of "average intelligence" when explaining why he was dismissed as a defendant from Parker v. LTSC.  He then posted a message threatening to sue Plaintiff in his home state, and claiming he would win.

65.    Plaintiff avers that Defendant Geiger was perfectly aware of the nature of the complaint against him in Parker v. LTSC, and "played dumb" so as to elicit sympathy from this court and get the case dismissed, and that in reality, he was counting on the false impression he created to achieve his ends, knowing full well that this court would likely play right into his hands in its rulings while he continues to make a mockery of them on the internet.

## Averments Specific To Defendants LTSC/Formhandle

66.    Defendant LTSC and Formhandle are referred to collectively in this action because one entity acts on behalf of the other and vice versa.  While LTSC has other officers, all known actionable conduct by LTSC was engaged in or directed by Defendant Formhandle.

---

[20] This posting was made in response to a deliberately vague posting by Plaintiff where he asked no one in particular if the directory "g:\ssers" was familiar.  The "g:\ssers" directory was a reference to a local hyperlink (i.e., to the author's computer) that appeared on the RayFAQ and indicated involvement by Defendant Ross his followers.

67.    Defendants Formhandle/LTSC created the website at http://www.fastseduction.com
(the LTSC website) sometime in 1999. At the time, the LTSC website contained a few original
articles on seduction, and a searchable archive of ASF (at the time, DejaNews had removed its
USENET archive and Google had not yet put it back up).

68.    On or around October 15, 2001, Defendants Formhandle/LTSC expanded the offerings
on the LTSC website to include a message board system, which they refer to as "mASF" for
"moderated ASF." The "mASF" boards are readable through the same newsreader software
(such as Outlook Express) that is used to download messages from USENET, and the boards
themselves are named after ASF, e.g., "alt.seduction.fast.general," "alt.seduction.fast.advanced,"
"alt.seduction.fast.fieldreports," and so forth.

69.    Shortly thereafter, Defendants Formhandle/LTSC came to an agreement with Ross
Jeffries over the role the LTSC website would play on the original USENET ASF. It was agreed
by them that they would "share" ASF as mutually exclusive marketing turf.

70.    As part of the "sharing agreement," Defendants Formhandle/LTSC and Defendant Ross
agreed to the publication of the "ASF FAQ," as outlined previously in paragraphs 23-25. The
ASF FAQ referred to the websites run by these defendants as the "main, group-related sites."

71.    Plaintiff avers that the similar names of the LTSC message boards to ASF, and the use
of a "newsgroup FAQ" to promote the sites, which includes the force of ISP TOS policies to
enforce the FAQ, was designed with the intention of these Defendants to "hijack" traffic from
the ASF group to the LTSC message boards, for the purpose of providing content for the LTSC
website, and for building a lucrative base of "newbies" to which LTSC and Defendant Ross
could pitch their products and affiliated products, and secure the resulting revenue, which they
would not have been able to do on USENET.

72.   Defendants Formhandle/LTSC and Ross intended to "corner the market" on the ASF audience through its conduct as set forth above, and explicitly agreed among themselves to enforce their FAQ document by any means possible (legal or illegal) against anyone who challenged their self-asserted authority.

73.   The impact of this collusion is enormous, and only beginning to come to light, as the mainstream media is tapping into the counterculture that is ASF.[21]  This includes the recent movie *Hitch,* the burgeoning "wingwoman" industry, and of course the many gurus who offer e-books, personal coaching, and workshops and seminars.  More than one guru now earns a six-figure income or more as a direct result of ASF.

74.   The actions of Defendants LTSC/Formhandle and Ross have ensured that LTSC (and Ross, through marketing by LTSC) receives a "tribute" from many newly-minted gurus, who find they have to establish affiliate marketing partnerships with LTSC to have their existence acknowledged on its message boards, something that would not be the case had the ASF group on USENET been left alone.

75.   Like Defendant Ross, Defendants LTSC/Formhandle leave the "dirtywork" to third parties from which it attempts to distance itself (such as Anon-1 and Anon-2 and Defendant Geiger).  In the case of Anon-1, Defendants LTSC/Formhandle were well aware of the repeated anonymous defamation concerning Plaintiff which appeared on ASF (LTSC archived the group during the time in controversy so they downloaded every message), along with the link to the RayFAQ, and while Defendants LTSC/Formhandle claim that they have no control over anonymous third-party postings (assuming they didn't direct them), they did and do have control over the publication of the ASF FAQ which spawned the conduct of the third parties.

---

[21] Due out from ReganBooks this summer is "The Game" by Neill Strauss, which documents the evolution of the "seduction community."  There have also been several articles in other major publications (such as *Elle*), and the movie "Hitch" was loosely based on a seduction guru named "Mystery."

76.    Plaintiff nonetheless avers that Defendants LTSC/Formhandle, Ross, and Geiger all

conspired and colluded to give their sanction to this conduct, at the bare minimum by declaring

an "open season" on Plaintiff, playing at the least an identical role to that of an authority figure

would play in an assault after instructing a group of loyal followers to "get him."

77.    Like Defendant Ross, Defendants Formhandle/LTSC made numerous statements

themselves which were relevant to this action, including:

    a.    "I'm a bit swamped right now but would appreciate someone or a few people
to take the time to dig up specific pasts posts of Gordon Roy Parker (aka Ray Gordon)
where he publicly admits to having bipolar/bi-polar disorder (suffers from manic
depression). Yes, it's related to the case." (April 27, 2004)

    b.    "Ray, Ross' products rival yours the way chocolate mousse in a crystal serving bowl
rivals a shit stain on the heel of a shoe. And THAT is my OPINION." (April 30, 2004)

    c.    "I hope you guys aren't suprised. It seems the details of the motion to dismiss are finally
sinking in for him." (April 6, 2004)[22]

    d.    "You're not banned because you have a dissenting opinion, you're banned because you're
an asshole who has a habit of annoying the hell out of people endlessly." (May 14, 2004).

    e.    "As LTSC's lawyers have also done - *arguments in regards to all the other
defendants.* Parker seems to believe he can magically apply some rule to convince the
court that such a move somehow denotes an appearance on the part of LTSC's counsel in
regards to the other defendants." (May 19, 2004). (Emphasis Added).

    f.    "If he does quote or provide some sort of reference, and it's a forum for which he's been
told he's been told he's not allowed any form of access, and confirmed receipt of such a
statement, he will be admitting to electronic trespass over state lines." (May 27, 2004)

    g.    "[Plaintiff's] affiliates probably have some form of affiliate agreement. Or, at the very
least, they would probably be interested to know the type of person/business promoting
their products...if any of them were to get numerous e-mails from people in regards to an
affiliate, *they may decide having that person as an affiliate might not be such a good
idea.*" (June 2, 2004 to ASF).

    h.    "The only other legal liability I'm aware of is an admission from you in regards to
accessing mASF when you've been informed multiple times not to and that it would be
treated as electronic tresspass across state lines." (June 9, 2004)

    i.    "Ray Gordon is Off-Topic on all of mASF. Not even in Off-Topic. Period." (Subject:
"Ross Jeffries And Ray Gordon" posted to the LTSC message boards, June 10, 2004).

---

[22] This post was made in response to a post that said "I believe Gordon Roy Parker is in the midst of a full blown
manic."

j.    "Doesn't he have a support e-mail on his web site?  Why is this being asked here?  FS has yet to even link to that book/website." (June 10, 2004 to LTSC).

k.    "Check the kill-filter list, plenty of entries for [Plaintiff] in there." (June 12, 2004 to the LTSC message boards).

l.    "I met with not 1 but 2 companies last week who are, this week, offering me well-paying full-time positions....That is what happens when you have highly marketable skills and employability... and personalities people can get along with." (June 14, 2004 to ASF).

m.    "It would be pretty simple for me to pass along the block definitions to Thundercat, presuming his web host uses Apache and allows URL re-writing in the configuration file. Maybe I'll get around to it after the database/search upgrades..." (June 30, 2004 to ASF).

n.    "He can pay LTSC back via a work-for-reparation program, but then again he's not really qualified to work in any capacity for LTSC.  He's welcome to mail LTSC a resume, though." (July 8, 2004 to ASF).

o.    "The automatic posts are meant to save uASF newbies from the garbage and offer them the mASF option.  (July 11, 2004 to ASF).

p.    "Presuming Alex's parents are actually divorced, how would you find this information out unless you were CYBER-STALKING someone?  Is this an activity your ISP should know about? (July 11, 2004 to ASF).

q.    "Crazy fucked up deranged people tend to believe they are sane and repeat the same mistakes over and over.  Gordon Roy Parker aka Ray Gordon always believes he's in the right and tends to repeat the same bullshit over and over." (August 14, 2004).

r.    "You can probably try to appeal but that's your only course of action.  If you lose the appeal, you can't re-file against those defendents." (August 15, 2004 to ASF, referring to the dismissal of the Does in this case as being with prejudice).

s.    "I also don't want to see people bashing on each other.  Just because someone's philosophy of PU doesn't match someone else's, that is not a reason to slam the other person - rather, perhaps it's an opportunity to DEBATE and DISCUSS the differences.  I don't care to name names, too many have been doing it the past 6-12 months and it seems to come mostly from people aligned with commercial interests (whether directly or through affiliations/friendships)." (August 15, 2004 to LTSC).

t.    "If I have to go through another day where I wake up in the morning to politically-saturated e-mails and posts, that is a day that heads will roll.  If the politics are tied to commercial ventures in any way, heads will roll even faster." (August 16, 2004 to LTSC).

u.    "I wonder how he'll be able to log onto the Internet and claim victory *when a court-appointed mediator is taking away his computer* as part of comepnsatory damages to LTSC.  I surely would hope he finds a cyber cafe so he can let us all know about that victory." (August 23, 2004 to ASF).

v.     "LTSC's income is disclosed regularly -- to its accountant and to the IRS. Would you like the contact info of the IRS?..I can also inform them of your WTC comments, as well as the time you quoted a story here about a gun/violence-related incident in a PA court. I'm not sure how they will connect all that information but I'm certain they will find it interesting." (August 25, 2004 to ASF).

w.     "Apparently you need a study to inform you of this, as it doesn't seem (by your own accounts) you've been able to stay in any workplace long enough to see it for yourself." (September 1, 2004 to ASF).

x.     "...said the wackjob who posts more than anyone else." (September 2, 2004 to ASF, referring to Plaintiff).

y.     "The only one doing any "scorching" here the past few years has been Gordon Roy Parker." (September 2, 2004 to ASF).

z.     "It seems to me that unless [Plaintiff] has kept his Google searching to rather innocuous or innocent terms like "religious holidays", "baseball scores", or "party jokes", he might be in for some interesting exposure as Google, now that he's trying to sue them, has the right to include his history of access to their web site as well who knows what % of all his searches over the years. Anyone care to guess what [Plaintiff's] search history might contain? (September 7, 2004).

aa.    "Maybe you should consider a sex change operation and become an "office whore". You might only have to suck a few dicks, but your income might increase substantially." (September 9, 2004 to ASF).

ab.    "Seems like a good business practice to me." (September 15, 2004, to ASF, in reference to allegations that a Ruby Tuesday's restaurant told waitresses to "have their date face on" at work).

ac.    "An ultimate solution was found in regards to the Ray problem. See my sig." (November 19, 2004 to ASF).

ad.    "You are not a [business] competitor. You are, however, an annoying fuckwit and a poo-poo head." (November 19, 2004 to ASF).

78.    Plaintiff avers the following, for each of the statements in paragraph 77 above:

a.     This statement shows active collusion between Defendants Formhandle/LTSC and the ASF populace in that they are requesting assistance in "digging up dirt" on Plaintiff.

b.     This statement praises Defendant Ross (of whom LTSC is an affiliate), while disparaging Plaintiff in an attempt to intentionally mislead consumers regarding the quality of his goods. Defendants LTSC/Formhandle were motivated by the simple fact that they profit from the sale of Defendant Ross's work, but not from Plaintiff's.

37

c.     Plaintiff avers that, at the time of publication, Defendant Formhandle either knew or should have known that Plaintiff was not in a "manic phase" when he posted at that time.

d.     In this statement Defendant Formhandle is misleading the public concerning why the LTSC message boards were created, which was to give Defendant Ross a "safe haven" for discussing his work, free of major dissent, on a site where his partnership with the owner was cloaked.

e.     This statement constitutes an explicit acknowledgment by Defendants Formhandle/LTSC that its attorneys had moved this court on behalf of the other defendants in Parker v. LTSC.

f.     Defendants Formhandle/LTSC are claiming in this posting that Plaintiff would be guilty of electronic trespass if he even admitted to viewing the LTSC website.  This is an attempt to intimidate Plaintiff with the threat of criminal prosecution, using fear and coercion to increase LTSC's business revenue at the direct expense of Plaintiff.

g.     Defendants Formhandle/LTSC made this posting for the purpose of inciting third parties into interfering with Plaintiff's affiliate agreements by contacting his affiliates and disparaging Plaintiff, with full knowledge and awareness of the contracts.

h.     This post is another "electronic trespass" threat by Defendants Formhandle/LTSC.

i-j.     The post in (i) informs users of the LTSC message board that Plaintiff's name is not to be mentioned in any discussion, not even "off-topic" ones.  The message in (j) criticizes a poster for asking a "loaded" question believed to be used as a pretext for putting a link to the website in the posting.  By contrast, Defendant Ross is allowed to use his signature in his LTSC message postings.

k.     This message directs users to the "ASF Master Killfilter List" which includes Plaintiff's name, his business, and his work, many times over, effectively disparaging same to the LTSC audience.

l.     Defendants Formhandle/LTSC were attempting, with this posting, to impute unemployability upon Plaintiff, despite having known (or should have known) that Plaintiff was not only employable, but steadily employed at the time the post was made.

m.     This post shows Defendants Formhandle/LTSC visiting another website (Thundercat's Seduction Lair) and offering the webmaster confidential information regarding Plaintiff's IP addresses, and encouraging Thundercat to bar Plaintiff from posting to his lair.[23]

n.     This post further disparages Plaintiff's work capabilities to a large audience.

o.     This post explains why these defendants "spam" ASF with directions to the LTSC message boards.

p.     At the time of publication, these defendants either knew or should have known that Plaintiff was not deranged.

q.     At the time of publication, these defendants either knew or should have known that Plaintiff was not cyberstalking "Alex Kaufmann." The posting further reveals a desire to interfere with Plaintiff's business relationship with his ISP, to harm his business.

r.     These defendants, in this posting, are claiming that despite Parker v. LTSC having been dismissed without prejudice, that for some reason Plaintiff cannot refile the action.

s-t.     In the post in (s), these defendants deride those who "exploit" the LTSC website by having "commercial interests," yet the derision only seems to apply to those who are not LTSC sponsors. This effectively creates an "LTSC tax" on seduction gurus that extends to the

---

[23] In the past, Thundercat had linked to the RayFAQ from his website.

USENET audience.  In the post in (t), these defendants claim that "heads will roll" if the "flame wars" are "tied to commercial interests."  This policy again only applies to non-sponsors.

      u.    In this posting these defendants are threatening Plaintiff with the loss of his personal computer if he files suit, despite the bankruptcy laws which would prohibit this.

      v.    In this posting, these defendants mention contacting the IRS regarding Plaintiff's internet postings and threatening to impute a link between Plaintiff and "gun-related violence" to them.[24]

      w.    At the time of publication, these defendants either knew or should have known that Plaintiff has been able to hold jobs for extended periods of time.

      x.    At the time of publication, these defendants either knew or should have known that Plaintiff is not a "wackjob" and that to call him such is misleading, and portrays him in a false light.

      y.    At the time of publication, these defendants either knew or should have known that to accuse Plaintiff of "scorching" the ASF "earth" was misleading, especially given that these defendants are the ones responsible for inciting others to post off-topic and to perpetually attack Plaintiff with a "Black PR" campaign.

      z.    These defendants now impute to the ASF audience that Plaintiff's Google search history would be 1) disparaging; and 2) relevant to Parker v. Google.  The purpose of this posting was to use fear and intimidation to coerce Plaintiff into dropping that lawsuit, for the purpose of harming his business so that these defendants could obtain property in the form of increased market share.

---

[24] Plaintiff had quoted an article about a man who shot a teenage girl who refused to kiss him and noted that the man was foolish for responding this way to her rejection.

aa-ab.        These crass postings demonstrates malicious intent on the part of these defendants. The post (ab) endorses an alleged policy by a restaurant to tell waitresses to have their "date face" on for male customers.

ac.    These defendants refer to Plaintiff as the "Ray problem" and offer the LTSC website as a "solution." The purpose of this posting was to mislead the public concerning the overall content of ASF, and Plaintiff's contributions to same.

79.    It is clear from the averments hereinabove that Defendants LTSC/Formhandle's mission is to "hijack" the ASF newsgroup for its own commercial purposes, and to satisfy its Seduction-Mafia agreement with Defendant Ross. The statements cited in paragraph 77 were made in furtherance of that purpose.

## Defendants Specific To Defendant Trustees Of The University Of Pennsylvania

80.    On July 16, 2001, Plaintiff filed an EEOC charge against the University of Pennsylvania. On February 4, 2002, he filed suit in this district under Title VII and the ADA. That case (Parker v. University of Pennsylvania, E.D.Pa. #02-567), was dismissed in September 2004, and an appeal was denied by the Third Circuit on April 18, 2005. A petition for rehearing en banc is pending.

81.    On September 11-12, 2001, nonparty "Wintermute" posted two highly threatening messages concerning Plaintiff that were set forth in paragraphs 30-33 of this complaint under the averments specific to Defendant Ross. These messages were posted by a user of the "GreekNet" system of the University of Pennsylvania.

82.    As averred, shortly after filing a complaint against Wintermute with the case assigned to Detective James B. Blackmore of Penn, Plaintiff was confronted with e-mailed copies of defamatory internet postings that Detective Blackmore had mistakenly believed were posted by

Plaintiff. Detective Blackmore then began quasi-interrogating Plaintiff in a tone of voice which led Plaintiff to believe that Detective Blackmore "had something" on Plaintiff. The detective backed off once he realized that all he had was defamatory hearsay.

83. Detective Blackmore told Plaintiff on or about September 13, 2001 that he had instructed Wintermute to cease and desist, Wintermute posted a message to ASF on September 15, 2001 confirming that he had been "instructed not to speak to Plaintiff."

84. On November 21, 2002, Plaintiff subpoenaed Wintermute's identity from Penn, and was told several times, culminating in a hearing of February 12, 2003 before Judge Kelly, where Detective Blackmore and David Millar of Penn testified under oath that Penn could not identify Wintermute, and that it was possible to post messages anonymously to USENET.

85. While researching Parker v. University of Pennsylvania, Plaintiff uncovered compelling evidence that the Wintermute messages were in fact easily traceable, known to Penn all along, and that the IP addresses from which Wintermute posted did not change over periods of several months.

86. Plaintiff avers that Penn, through at least Detective Blackmore, was aware of Wintermute's identity at all times and committed the act of perjury at the hearing and in its verified responses when it claimed otherwise, specifically for the primary purpose of obstructing justice in favor of a student, and for the secondary purposes of obtaining goodwill for future students and current alumni by "protecting its own."[25]

87. Since that hearing, several key pieces of information about Wintermute have come to light, including:

      a.    He graduated in 2004, with a major in engineering and a minor in mathematics.

---

[25] Penn again made claims of not knowing the identity of its student internet users when subpoenaed last year by the RIAA.

b.   He posted his height, age, weight, and other information about himself.

c.   He posted his own picture and that of his girlfriend to a "seduction conquest"

section of a "pickup" website (www.auseduction.com) which is similar in nature to and affiliated

with the LTSC website.

d.   His hometown address (which Penn has) is located in the state of Massachusetts.

e.   Since graduating, he has moved to Austin, Texas and works a full-time job.

88.   Plaintiff avers that because he sought discovery relating to the above from Penn (in

Parker v. University of Pennsylvania, that Penn has been aware for over a year of this

information.

89.   Very shortly after the hearing of February 12, 2003, Penn sharply altered its defense to

Parker v. University of Pennsylvania.  Despite having not previously raised the defense, Penn

began claiming that it planned to argue that Plaintiff was "unemployable" and moved the court

for a Rule 35 examination related to employability and a claim for emotional distress damages,

which was granted and which currently stands on appeal.[26]

90.   Once the Rule 35 examination was upheld, ASF and USENET in general turned into a

"feeding frenzy" regarding Plaintiff's mental condition.  One comment after another appeared

which misinterpreted the nature of the ruling, going so far as to claim that the court had

questioned Plaintiff's sanity and was laying the groundwork for having him involuntarily

committed or ordered to undergo treatment.

91.   In April 2003, a man later identified through discovery as Osgaldor Storm (a Seduction

Mafia operative from the NLP community) began threatening Plaintiff's life repeatedly.  In a

---

[26] That opinion was unpublished.  The appeal # is 04-3688 in this circuit.  In response to that motion, Plaintiff had submitted an affidavit of current employment which showed he was employed.

message dated April 15, 2003, Dr. Storm stated that he had previously worked for Penn and that Penn in fact had "put him up" to making the threats.

92.    Penn has not filed any legal action against Dr. Storm in response to his statements, nor has it ever publicly disclaimed or otherwise refuted his statements concerning them.  When offered Plaintiff's discovery evidence, they informed Plaintiff through their counsel that they "had no need" for it.

93.    On September 10, 2003, Defendant Penn, through its counsel, threatened Plaintiff with a "Dragonetti" lawsuit if he continued to litigate improperly against them in "any" lawsuit which was currently pending involving them.  This because at the end of Parker v. Tilles, Plaintiff said "there will be more" (as in an appeal of that case).  Plaintiff further avers that any lawsuit he has filed involving Penn has not run afoul of Dragonetti, and that Penn has had no reason to believe this.  Rather, their purpose was to attempt to intimidate Plaintiff into dropping his appeal.

94.    The evidence discovered in Parker v. University of Pennsylvania revealed that Penn had downloaded the RayFAQ (therefore proving its existence and reading by third parties, including a past and potential employer/client of Plaintiff's), not only from the ray-gordon.com website, but also from a previous hosting of it at 0catch.com.[27]

95.    Plaintiff avers that the preponderance of the evidence indicates that Defendant Penn colluded with Osgaldor Storm to threaten Plaintiff.  Alternatively, he avers that Defendant Penn was an accessory after the fact because it chose to "stand down" in the face of Dr. Storm's posted threats despite their allegedly disparaging nature.[28]

---

[27] In December 2002, Plaintiff was able to successfully remove the RayFAQ from any free webhost simply by inquiring of the host if its sponsors were aware of where their advertisements were appearing.  This "chased" the publisher of the site to its own domain, where it could more easily be held accountable.
[28] That Penn chose to threaten Plaintiff with a Dragonetti lawsuit yet do nothing to publicly refute Dr. Storm's postings should be noted by this court.

96.   Plaintiff avers that once Defendant Penn committed perjury at the hearing of February 12, 2003, it had to "cover its tracks" by attacking Plaintiff's employability as a means of preventing him from working at Penn and ever obtaining any "insider" evidence which would have uncovered the perjury.

97.   Plaintiff avers that Defendant Penn's conduct regarding Wintermute and Osgaldor Storm was in retaliation for Plaintiff having filed an employment charge with the EEOC and lawsuit, and in retaliation for his having reported the federal crime of making terroristic threats over federal wires, by Wintermute.  Plaintiff further avers that another purpose for this conduct was to interfere with his employment and livelihood as both a worker and business owner, and to gain pecuniary benefit in the form of the goodwill and alumni contributions increasing as a result of their "protecting their own."

98.   Plaintiff avers that Defendant Penn had foreknowledge of the Seduction Mafia and was well aware that it was furthering its enterprise mission through its conduct as averred herein, and that it colluded directly with Wintermute, the operative who was its liaison to the "group."

**Averments Specific To Defendant Matthew S. Wolf, Esquire**

99.   Defendant Matthew S. Wolf, individually and through the law firm of Wolf & Booth (who withdrew mid-case), represented Defendants LTSC/Formhandle in Parker v. LTSC.

100.  In its motion to dismiss Parker v. LTSC, Defendant Wolf, on behalf of Defendants Formhandle/LTSC, moved this court to dismiss the entire case, against all defendants alleged to be part of the Seduction Mafia.

101.  In its Motion To Quash Subpoenas Duces Tecum (including those filed in other districts), Defendant Wolf, at the urging of Defendants Formhandle/LTSC,

102.  By moving this court in such a fashion, Defendant Wolf, at the urging of Defendant LTSC, provided valuable legal consultation to the alleged co-conspirators.

103.  Defendant Wolf was not retained by anyone other than Defendants LTSC and Formhandle, and never formally entered an appearance on their behalf.  He could not possibly have performed any due diligence regarding the claims against those Defendants, nor could he have known, without actually having consulted with those Defendants, what their legal wishes were.

104.  Plaintiff avers that the purpose of Defendant Wolf's conduct was to further the enterprise mission of the Seduction Mafia by "ghosting" as its attorney, where formal representation would have been impossible due to the nature of the claims.

105.  Plaintiff avers that Defendant Wolf, with the foreknowledge and approval of Defendants Formhandle/LTSC, used both the Motion to Quash Subpoenas Duces Tecum and LTSC's Motion To Dismiss for purposes for which they were not intended, namely to move the court on behalf of individuals who were not his clients, and to provide tangible, pecuniary resources to the Seduction Mafia.

## COUNT I: RACKETEERING AGAINST ALL NAMED DEFENDANTS

106.  Plaintiff incorporates by reference, the entire contents of paragraphs 1-105, as if fully set forth verbatim herein.

## The RICO Enterprise (Seduction Mafia)

107.  The RICO enterprise relevant to this count is the Seduction Mafia, an association-in-fact enterprise.

108.  The Seduction Mafia's principals (directors) are Defendants Ross, LTSC/Formhandle, and Geiger (who is also averred to be Anon-1 and Anon-2).  Its operatives named in this

complaint are Defendants Trustees of the University of Pennsylvania and Wolf. Operatives not named in this action whose conduct is cited include "Wintermute," "Aardvark," and Alex Kaufmann.

109. The current pattern of racketeering activity began on September 11, 2001, with the commission of the first predicate acts by Wintermute. The most recent pattern of racketeering activity began on October 15, 2001, with the creation of the LTSC message boards ("mASF").

110. The Seduction Mafia is an ongoing concern which has engaged in its pattern of racketeering activity for a period of longer than twelve months, and which will continue to engage in this activity in perpetuity unless enjoined by this Court.

111. The Seduction Mafia profits from advertising and affiliate revenue from products it promotes and sells through the LTSC website.

112. The Seduction Mafia routinely uses extortion to "hijack" the traffic from a public USENET newsgroup ("ASF"), and to divert it to the LTSC message boards, where only those vendors who "pay tribute" to the Seduction Mafia (or who otherwise aid it) are permitted to openly promote their products through the site.

113. The net result of the Seduction Mafia's overall conduct is to impose a "tax" on ASF by commandeering the group, flooding it with off-topic messages from operatives who alternate between defaming Plaintiff and directing traffic to LTSC on the grounds that the ASF newsgroup is "destroyed," and "replacing" ASF with its own message boards, where LTSC sponsors are the primary "discussion" topics.

114. The Seduction Mafia's conduct impacts all businesses similarly situated to Plaintiffs in that anyone who sells seduction advice and who doesn't "pay tribute" to the Seduction Mafia will suffer similar consequences to Plaintiff's.

115. Those who profit from the Seduction Mafia rarely badmouth each other and will attack any "outsiders" who threaten their revenue stream or who don't create revenue for LTSC.

**Defendant Ross's Participation In The RICO Enterprise**

116. Defendant Ross created the Seduction Mafia for the purpose of gaining and protecting market share for the Speed Seduction website and its related product line. Defendant Ross participated in the Seduction Mafia as follows:

a.   By conspiring with Defendants Formhandle/LTSC to "carve up" ASF as their own personal marketing "turf," and conspiring with third parties to enforce that turf through the predicate acts set forth herein, and through the continued and repeated publication of the "ASF FAQ."

b.   By directly commissioning Defendant Geiger to cause publication of the RayFAQ website, and to organize the operatives listed above (and others) to link to it.

c.   By making statements to ASF designed to incite third parties to aid and abet the Seduction Mafia through the commission of other predicate acts, including but not limited to effectively declaring "open season" on Plaintiff for as long as he continued to post to ASF.

d.   By offering resources in the form of professional legal services and/or through the unauthorized practice of law through his postings where he urges people to "sue ray NOW! Ask me how!"

e.   By directing the conduct of Defendant Aardvark, including his repeated defamation, his threats of prosecution for nonexistent crimes, and his letter to this court and other public officials urging them to "Baker Act" Plaintiff.[29]

117. Plaintiff avers that the conduct set forth in paragraph 116 above constitutes separate RICO predicate acts in the form of Hobbs Act violations (18 USC §1951 *et seq.*), because

---

[29] See Paragraph 35(c) for all of Aardvark's postings, and paragraph 35(c)(21) for the specific letter in question.

Defendant Ross has used fear and coercion, directly and through conspiracy with and encouragement of third-party co-conspirators, in an attempt to prevent Plaintiff from posting messages to ASF and marketing his work, and that by doing so, he has obtained property from Plaintiff in the form of sales revenue and goodwill.

118. Plaintiff avers that Defendant Ross has committed at least two predicate acts in furtherance of the Seduction Mafia as a principal, in violation of 18 USC §1962(c).

119. Plaintiff avers that the conduct averred in paragraph 116 above also constitutes separate violations of the Sarbanes Oxley Act (18 USC §1513(e)), in the form of interference with his livelihood and employment in retaliation for his having reported the federal crime of the threats by Wintermute to the Department of Public Safety at the University of Pennsylvania and having publicized the reporting of this threat to ASF.

120. Plaintiff avers that Defendant Ross has derived direct pecuniary benefit from the Seduction Mafia, and invested the proceeds in further racketeering activity (the Seduction Mafia's ongoing conduct), in violation of 18 USC 1962(a).

121. Plaintiff avers that Defendant Ross, through the conduct averred herein, assumed control and direction of the affairs of the Seduction Mafia in violation of 18 USC 1962(b).

122. Plaintiff avers that Defendant Ross, through the conduct averred herein, violated the Hobbs Act multiple times through the use of fear and coercion (including the use of third parties such as Wintermute and Aardvark) to obtain property from Plaintiff in the form of business revenue and goodwill, in violation of 18 USC 1951(b), and by doing so in conspiracy, violated 18 USC §1962(c) by committing at least two predicate acts for the Seduction Mafia.

123. Plaintiff avers that Defendant Ross's incitement to third parties to pursue legal action against Plaintiff, and the offer to assist in same, constitute aiding and abetting the Seduction Mafia, also in violation in 18 USC §1962(d).

124. Plaintiff avers that each of Defendant Ross's violations of 18 USC §1962(a-c), also constitute separate violations of 18 USC §1962(d).

### **Defendants Formhandle/LTSC's Participation In The RICO Enterprise**

125. Defendants Formhandle/LTSC, in agreement and collusion with Defendants Ross and Geiger, created the current pattern of racketeering activity of the Seduction Mafia.  At all relevant times herein, Defendant Formhandle was acting on behalf of Defendant LTSC, and vice versa.

126. Defendants Formhandle/LTSC's actionable conduct relating to the Seduction Mafia includes, but is not limited to, the following:

a.     Illegally claiming ASF as "turf" for LTSC through the continued and repeated publication of the ASF FAQ, effectively declaring "open season" on Plaintiff.

b.     Conspiring with the other Seduction Mafia principals, and through the use of Seduction Mafia operatives, to "defend" their self-proclaimed "turf" that is ASF through the pattern of racketeering activity set forth herein in exchange for the illegitimate and nonexistent "right" to publish the ASF FAQ to market the LTSC website, where these defendants can demand "tribute" from any seduction guru who wants their products "discussed" on the LTSC website, and use coercion and the threat of blackballing for noncompliance.

c.     Aiding and abetting the commission of predicate acts by explicitly endorsing them in his "ASF FAQ" and in Formhandle's postings cited in paragraph 77, while bestowing a

nonexistent and illegitimate authority upon himself to enforce rules of conduct on the group, and

through the direct defamation and disparagement of Plaintiff as set forth in paragraph 77.

      d.    To continue to engage in the conduct set forth in subparagraphs (a-c) above

despite having repeatedly been put on notice of the conduct and the damages it was causing to

Plaintiff, and that Defendant was profiting directly from the RICO enterprise and its operations.

      e.    Aiding and abetting the Seduction Mafia through the abuse of civil process via its

use of LTSC's attorney, Defendant Wolf, as previously set forth in paragraphs 99-105, and

through the provision of "off the record" legal services to the Seduction Mafia, funded by LTSC.

      f.    Threatening Plaintiff with "contacting the IRS" (see paragraph 77(v)) with

irrelevant and bogus claims regarding Plaintiff, including an imputation linking Plaintiff to "gun

violence."

      g.    Threatening Plaintiff (see paragraph 77(u)) with the loss of his home computer

(which would keep him off the internet, of course), for the purpose of satisfying a nonexistent

and unlawful debt on behalf of Defendant LTSC, in violation of the federal Unfair Debt

Collection Practices Act (a RICO predicate).

      h.    Using fear and coercion, in violation of the Hobbs Act, to attempt to induce

Plaintiff into surrendering business revenue by not "stepping on the toes" of the Seduction Mafia

principals (i.e., by not posting to ASF or promoting his business, or even *being* in business).

   127. Plaintiff avers that Defendants LTSC/Formhandle, through the conduct averred herein,

assumed control and direction of the affairs of the Seduction Mafia in violation of 18 USC

1962(b).

128. Plaintiff avers that Defendants LTSC/Formhandle have derived direct pecuniary benefit from the Seduction Mafia, and invested the proceeds in ongoing racketeering activity, in violation of 18 USC 1962(a).

129. Plaintiff avers that Defendants LTSC committed the RICO predicate acts of fraud (through its attorney's abuse of process), a violation of the Hobbs Act for each predicate act committed by any member of the Seduction Mafia which relates to the enforcement by operatives and other principals of the ASF FAQ, because this conduct involved the use of fear and coercion to obtain property in the form of audience share and revenue from Plaintiff), the violation of the UDCPA, and further avers that because these actions were taken in conspiracy with the Seduction Mafia, that they are in violation of 18 USC §1962(c).

130. Plaintiff avers separate violations of 18 USC §1962(d) for each violation of 18 USC §1962(a-c) above, and for the nonpredicate acts committed by Defendants LTSC/Formhandle in furtherance of the Seduction Mafia.

131. Because these acts were committed in conspiracy with the Seduction Mafia, Plaintiff avers a violation of 18 USC §1964(c) by Defendants Formhandle/LTSC.

### Defendant Wolf's Participation In The RICO Enterprise

132. When Defendant Wolf *twice* moved this court on behalf of the other Defendants in Parker v. LTSC, he overstepped the attorney-client boundary and became nothing more than a Seduction Mafia operative with a license to practice law.

133. Defendant Wolf's retainer was paid for by LTSC revenue (gained in part by Seduction Mafia conduct such as that by Doe #7 from Parker v. LTSC, who would link simultaneously to the RayFAQ website and the LTSC website, calling it the "official ASF website"), and donations to LTSC (including some by Seduction Mafia operatives such as Alex Kaufmann).

134. Defendant Wolf used money obtained by his client through a pattern of racketeering activity, and used that money to provide unauthorized and illegal legal services to the Seduction Mafia while simultaneously disclaiming any involvement with them by his client. These services were invested in furthering the pattern of racketeering of the Seduction Mafia in violation of 18 USC §1962(a) and, by definition, 18 USC §1962(d).

135. Defendant Wolf's Motion to Dismiss the claims against all Defendants in Parker v. LTSC constituted a gross abuse of process for the purpose of aiding and abetting the Seduction Mafia financially and operationally in further violation of 18 USC §1962(d).

136. Because Defendant Wolf's action were taken in conspiracy, Plaintiff avers a violation of 18 USC §1964(c).

137. Plaintiff avers separate violations of 18 USC §1962(d) for each violation of §1962(a-c) as outlined above.

### Defendant Geiger's Participation In The RICO Enterprise

138. Defendant Geiger conspired with Defendant Ross and Defendants Formhandle/LTSC to become a Seduction Mafia principal through his purchase of the ray-gordon.com domain, and to use that domain in furtherance of the Seduction Mafia.

139. Plaintiff avers, based upon information and belief, that Defendant Geiger is the sole publisher of the RayFAQ website, and that his claims that third parties are involved in its publication constitute a fraud upon both Plaintiff and this court, for the purpose of allowing himself to claim third-party ISP immunity under 47 USC §230 and other relevant statutes and torts.

140. Alternative to paragraph 139 above, Plaintiff avers that even if Defendant Geiger is not the actual publisher of the RayFAQ, that he caused its publication and assumed full legal

responsibility for the consequences of its publication by knowingly providing, for the express

purpose of aiding and abetting the Seduction Mafia, a vehicle by which the true publisher could

not be held accountable for what it publishes.

141. Plaintiff avers that each of the many publications of the RayFAQ during the times in

controversy constitutes a separate violation of the Hobbs Act (18 USC §1951(b)), because its

purpose was to use fear and coercion to obtain property from Plaintiff, and for the Seduction

Mafia, in the form of audience, market share, revenue and goodwill.

142. Plaintiff avers that each of the many publications of the RayFAQ (including links to

the FAQ from ASF posts) during the times in controversy constitutes a separate violation of the

Sarbanes-Oxley Act (18 USC §1513(e), because Defendant Geiger, with full knowledge that

Plaintiff had reported several crimes, and because he had reported those crimes (i.e., the threats

against Wintermute, and previous reports of child abuse in gymnastics), intended to retaliate

against Plaintiff for reporting those crimes by interfering with his employment and livelihood,

and his overall enjoyment of life.

143. Because these actions were taken in conspiracy, Plaintiff avers that Defendant Geiger

has participated directly in a pattern of racketeering activity in violation of 18 USC §1962(c),

through the commission of multiple predicate acts.

144. For aiding and abetting the Seduction Mafia (including but not limited to Plaintiff's

alternate pleading regarding the RayFAQ website and domain), Defendant Geiger has violated

18 USC §1962(d). This averment also includes the use of the RayFAQ website to shield

Seduction Mafia operatives from liability by linking to the site rather than republishing its

contents. Many of these link postings were anonymous and impossible to trace.

## Defendant Trustees Of The University of Pennsylvania's
## Participation In The RICO Enterprise

145. Defendant Trustees of the University of Pennsylvania committed separate predicate acts of obstruction of justice as follows:

    a.    By refusing to identify Wintermute in its reply to Plaintiff's Motion To Enforce A Subpoena Duces Tecum on or about December 18, 2002.

    b.    By fraudulently testifying in court on February 12, 2003 that it had no knowledge of Wintermute's identity, despite a prior admission by Detective Blackmore that it did.

    c.    By continuing to defraud Plaintiff by claiming it could not locate Wintermute.

146. Defendant Trustees of the University of Pennsylvania aided and abetted the Seduction Mafia by committing perjury in Parker v. Wintermute, and by abusing civil process through defamation of Plaintiff designed to portray him as one who would abuse discovery information rather than providing the information to Plaintiff that would have proven the alleged conduct in paragraphs 145(a-b) above.

147. Defendant Trustees of the University of Pennsylvania further aided and abetted the Seduction Mafia by abusing civil process based on contents of the RayFAQ relating to Plaintiff's mental condition, and changing course midstream in its discrimination lawsuit involving Plaintiff to move that court for a Rule 35 psychiatric examination, for which it offered no evidence in support, for a defense it had not raised in its initial pleadings, but which it instead constructed after downloading the RayFAQ on or about December 30, 2001 in an attempt to "dig up dirt" on Plaintiff.

148. Through its collusion with Osgaldor Storm, Defendant University of Pennsylvania violated the Sarbanes-Oxley Act by intentionally interfering with Plaintiff's employment and

livelihood in retaliation for his having reported Wintermute's postings to its Department of Public Safety.

149. Plaintiff avers that Defendant Trustees of the University of Pennsylvania, through its conduct as averred herein, violated 18 USC §1962(c), and by definition, 18 USC §1962(d), by engaging in a pattern of racketeering activity through the commission of at least two predicate acts (obstruction of justice and Sarbanes-Oxley violations) in furtherance of the Seduction Mafia.

150. Plaintiff avers that Penn's nonpredicate acts as averred herein constitute an additional violation of 18 USC §1962(d) for aiding and abetting the Seduction Mafia.

### Participation in the Seduction Mafia by other operatives

151. As already averred, a primary tactic of the Seduction Mafia is to rely on third-party "operatives," many of whom reside in other countries or who post anonymously and cannot be traced, to further its aims.

152. Defendant Geiger aided and abetted the operatives through his publication of the RayFAQ website, thus allowing them to commit the predicate and nonpredicate acts averred herein with a greatly reduced or eliminated risk of liability for the operative.

153. Operatives such as Osgaldor Storm and Player88 (believed to be James King) committed predicate acts through their repeated threats against Plaintiff (including Storm's threat against a protected computer in violation of 18 USC §1030(a)(7), a predicate act), also in violation of the Hobbs Act, because their purpose was to use fear and coercion to attempt to obtain property from Plaintiff in the form of audience, market share, revenue, and goodwill for the Seduction Mafia.

154. Plaintiff avers a separate violation of 18 PA §2710(a) for each publication of the RayFAQ, and each individual instance of linking to the site, as the purpose of the RayFAQ and

the linking is to harass Plaintiff in violation of 18 PA §5504(a)(1) because of a perceived

disability, by placing him in fear of bodily injury. Plaintiff further avers that because these

actions were taken in conspiracy with the Seduction Mafia, that they constitute separate state-law

predicate acts.

155. As joint tortfeasors, the Seduction Mafia principals and named operatives are liable for

all conduct of the unnamed operatives, including their predicate acts, as averred throughout.

156. The Seduction Mafia is an ongoing concern, with multiple victims (seduction

information providers), and its conduct will continue to harm others in perpetuity unless enjoined

by this court. The specific damage to these victims is a) the loss of any advertising revenue paid

to Defendant LTSC that otherwise would not have had to be paid, had ASF not been "hijacked"

and b) any damage caused by the Seduction Mafia's "enforcement" of its "ASF turf."

157. The Seduction Mafia began its most recent pattern of racketeering activity on or about

October 15, 2001 with the creation of the LTSC message boards and their marketing to USENET

as a "replacement for ASF" through the ASF FAQ and related "Master Killfilter List."

158. For the conduct averred hereinabove, Plaintiff is entitled to relief from each of the

named defendants under 18 USC §1964(c).

159. Plaintiff is entitled to unspecified compensatory damages from any combination of

each or all of the Defendants.

160. The deliberate, wanton and willful nature of the Defendants' conduct entitles Plaintiff

to the maximum punitive damages allowed by law.

161. The RICO statute (18 USC §1964(c) entitles Plaintiff to a trebling of damages.

162. Plaintiff is entitled to injunctive relief sufficient to terminate the RICO enterprise.

163. Plaintiff is entitled to costs of suit, including reasonable attorney fees.[30]

## COUNT II: CIVIL CONSPIRACY AGAINST ALL NAMED DEFENDANTS

164. Plaintiff incorporates by reference, the entire contents of paragraphs 1-163, as if fully set forth verbatim herein, with particular attention to all averments related to Count I.

165. Defendants Geiger, Ross, and LTSC/Formhandle repeatedly conspired to defame Plaintiff through the agreement to publish the RayFAQ and the ASF FAQ.

166. Defendants Ross and Formhandle/LTSC conspired with each other to violate the tort of unfair competition, or to the extent doing so is actionable under Commonwealth Law, to violate the Lanham Act, through the repeated postings of the false and misleading ASF FAQ, in a manner designed to cause a competitive pecuniary harm to Plaintiff by inducing consumers into believing that the LTSC and Speed Seduction websites were "required reading" for or "replacements" for ASF.[31]

167. Defendant Trustees of the University of Pennsylvania and The Seduction Mafia (through nonparty Wintermute) conspired to commit fraud (fraudulent misrepresentation) against Plaintiff by deceiving Plaintiff regarding his identity in a manner that caused Plaintiff economic harm through his detrimental reliance on their assertions as set forth.

168. Defendants Formhandle/LTSC and Wolf conspired to abuse process against Plaintiff by agreeing to use Defendant Wolf's representation of LTSC as a vehicle for improperly and illegally moving this court to dismiss claims against the other defendants in Parker v. LTSC.

169. For all other acts not specified here, but set forth throughout the Complaint, which are a) not precluded by Count I; and b) actionable under Pennsylvania law, Plaintiff avers a civil conspiracy on the part of all named defendants, who conspired among themselves and third

---

[30] Plaintiff is currently pro-se but is actively seeking counsel.
[31] The Lanham Act is not a predicate act, while PA's civil conspiracy tort requires conspiracy to violate a state tort. The Supremacy Clause would appear not to apply to the state-law civil conspiracy claim.

parties to violate Plaintiff's rights under the applicable civil laws within the Commonwealth. This includes, but is not limited to, injurious falsehoods (including all forms of defamation and trade defamation), tortious interference, invasion of privacy, unfair competition, fraudulent and/or negligent misrepresentation, and violations of the Commonwealth's "hate crimes" law (18 PA §2710(a), predicated on violations of 18 PA §5504(a)).

170.  As a direct and proximate result of the civil conspiracy, Plaintiff has suffered a loss of employment income (via employers "Googling" Plaintiff), a loss of business and investment revenue and goodwill, a loss of positive media exposure,[32] loss to his personal and business reputations, and the loss of positive interactions with third parties, and experienced a decreased general enjoyment of life.

171. For the conduct averred herein, Plaintiff is entitled to relief under the Pennsylvania tort of civil conspiracy.

172. Plaintiff is entitled to compensatory damages for lost wages, lost income, costs of defending the abuse of process, lost business revenue, lost audience share, goodwill, accumulated income, and appeal to investors.

173.  The wanton, willful and deliberate nature of Defendants' conduct entitles Plaintiff to the maximum punitive damages allowed by law.

174. Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct.

175. Plaintiff is entitled to costs of suit, including reasonable attorney fees.

## COUNT III: TORTIOUS INTERFERENCE
## AGAINST DEFENDANTS LTSC/FORMHANDLE

176. Plaintiff incorporates by reference, the entire contents of paragraphs 1-175, as if fully set forth verbatim herein.

---

[32] The Seduction Mafia has successfully confused the mainstream media into believing, as its website states. that it is the "Center of the Seduction Universe."

177. At all relevant times, Defendant Formhandle was aware of the existence of Plaintiff's business, its nature, and its affiliate agreements with his sponsors.

178. In the statement from paragraph 77(g), Defendant Formhandle advised the ASF audience to contact Plaintiff's affiliate sponsors and tell them that "maybe having [Plaintiff] as an affiliate might not be such a good idea."

179. In the statement from paragraph 77(m), Defendant Formhandle attempts to induce Thundercat into banning Plaintiff from his website, and offer him information regarding Plaintiff's IP addresses to assist him in doing so.

180. The defamatory statements from paragraphs 77(n), 77(p), 77(q), 77(w), 77(ac) and 77(ad) were also made with the malicious intention of interfering with Plaintiff's existing and potential business relationships, his employment relationships, and his general enjoyment of life.

181. Plaintiff avers that for each action cited above, which constitutes a separate act, Plaintiff is entitled to relief under Pennsylvania law for tortious interference.

182. For all relevant acts by third parties in this action which constitute tortious interference, including but not limited to a) the general dissemination of the RayFAQ; b) the enforcement by third parties of the ASF FAQ; and c) any threats or other actionable statements made by Seduction Mafia principals and operatives, Defendants LTSC/Formhandle are vicariously liable.

183. Plaintiff is entitled to relief for the following:

      a)    Compensatory damages for all economic losses;

      b)    Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

      c)    Injunctive relief sufficient to terminate the actionable conduct; and

d)    Costs of suit.

## COUNT IV: TORTIOUS INTERFERENCE AGAINST DEFENDANT ROSS

184. Plaintiff incorporates by reference, the entire contents of paragraphs 1-183, as if fully set forth verbatim herein.

185. As set forth in Count I, Defendant Ross is a Seduction Mafia principal. The averments directed at him in that count are restated here by reference as if set forth in their entirety.

186. As averred in paragraph 37(b), during the times in controversy, Defendant Ross repeatedly encouraged third parties to "sue Ray now!" and "put an end to abuse of process."

187. As outlined in paragraph 37(d), Defendant Ross referred to Plaintiff as a "nut job and a sociopath."

188. As outlined in paragraph 37(a), Defendant Ross encouraged anyone sued by Plaintiff to move the court for a psychiatric examination and to "watch him squirm."

189. As set forth in Count I, Defendant Ross is a Seduction Mafia principal. The averments directed at him in that count are restated here by reference as if set forth in their entirety.

190. At all relevant times, Defendant Ross was aware of the existing or potential business relationships between Plaintiff and the ASF readership at large, as well as Plaintiff's customers, affiliates, sponsors, potential customers, lovers, friends, employers, and the "quiet enjoyment" he is supposed to enjoy at his residence.

191. Defendant Ross's conduct was intended to knowingly and maliciously interfere with the business relationships set forth in paragraph 172 above.

192. As a direct and proximate result of Defendant Ross's conduct as set forth herein, Plaintiff has suffered incalculable and permanent economic harm, including loss of audience, market share, investment capital, investor appeal, accumulated wealth, loss of sales, business and

product reputation, and has made it impossible for Plaintiff to appear in public out of fear for his physical safety and that of anyone who does business with him.

193. Each predicate act committed by Defendant Ross, and each relevant act committed by any other Seduction Mafia principal or operative, further constitutes a separate act of tortious interference against Plaintiff for which Defendant Ross is vicariously liable, including but not limited to a) the ongoing publication of the RayFAQ, b) the anonymous postings imputing severe mental illness on Plaintiff c) linking simultaneously to the LTSC and RayFAQ websites; d) the threats made against Plaintiff by other operatives; and e) the "ASF FAQ" and "ASF Killfilter List" which disparages Plaintiff, and which was repeatedly published with his explicit knowledge and approval. Each separate publication of the ASF FAQ constitutes a wholly separate act.

194. Plaintiff is entitled to relief under the Pennsylvania common-law tort of tortious interference, including but not limited to for the following:

   a)    Compensatory damages for all economic losses;

   b)    Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

   c)    Injunctive relief sufficient to terminate the actionable conduct; and

   d)    Costs of suit.

## COUNT V: TORTIOUS INTERFERENCE AGAINST DEFENDANT GEIGER

195. Plaintiff incorporates by reference, the entire contents of paragraphs 1-194, as if fully set forth verbatim herein.

196. As set forth in Count I, Defendant Geiger is a Seduction Mafia principal. The averments directed at him in that count are restated here by reference as if set forth in their entirety.

197. At all relevant times, Defendant Geiger was aware of the existing or potential business relationships between Plaintiff and the ASF readership at large, as well as Plaintiff's customers, affiliates, sponsors, potential customers, lovers, friends, employers, and the "quiet enjoyment" he is supposed to enjoy at his residence..

198. Defendant Geiger's conduct was intended to knowingly and maliciously interfere with the business and personal relationships set forth in paragraph 179 above.

199. As a direct and proximate result of Defendant Geiger's conduct as set forth herein, Plaintiff has suffered incalculable and permanent economic harm, including loss of audience, market share, investment capital, investor appeal, accumulated wealth, loss of sales, business and product reputation, and has made it impossible for Plaintiff to appear in public out of fear for his physical safety and that of anyone who does business with him.

200. Each predicate act committed by Defendant Geiger, and each relevant act committed by any other Seduction Mafia principal or operative, further constitutes a separate act of tortious interference against Plaintiff for which Defendant Geiger is vicariously liable, including but not limited to a) the ongoing publication of the RayFAQ, b) the anonymous postings imputing severe mental illness on Plaintiff c) linking simultaneously to the LTSC and RayFAQ websites; d) the threats made against Plaintiff by other operatives; and e) the "ASF Killfilter List" which disparages Plaintiff.

201. Plaintiff is entitled to relief under the Pennsylvania common-law tort of tortious interference, including but not limited to for the following:

a)    Compensatory damages for all economic losses;

b)    Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

c)    Injunctive relief sufficient to terminate the actionable conduct; and

d)    Costs of suit.

## COUNT VI: INJURIOUS FALSEHOOD AGAINST DEFENDANTS GEIGER, ROSS, AND LTSC/FORMHANDLE

202. Plaintiff incorporates by reference, the entire contents of paragraphs 1-201, as if fully set forth verbatim herein.

203. This count (injurious falsehood) incorporates the following overlapping causes of action: libel, trade libel, slander, and false-light defamation.

204. Plaintiff restates all averments set forth in Counts I-V as if stated verbatim in their entirety.

205. Through their participation in the Seduction Mafia, Defendants acted in concert to cause all injurious falsehoods relevant to this count and are therefore vicariously liable for statements made by any Seduction Mafia member or operative.

206. As set forth extensively in this Complaint, the RayFAQ contains several injurious falsehoods which Defendants either knew or should have known were false or misleading, including (see paragraphs 52(a-e)):

a.    A claim that Plaintiff was "running an illegal bookmaking operation";

b.    An imputation that Plaintiff was mentally ill to the point of requiring involuntary commitment under Pennsylvania law, with encouragement to the RayFAQ audience to contact mental health agencies with falsehoods concerning Plaintiff.

   c.    Additional encouragement to the audience to contact media, law enforcement, and the University of Pennsylvania with falsehoods concerning Plaintiff.

   d.    Claims that Plaintiff had plagiarized the work of others.

   e.    Encouragement to the audience to post a "standard reply" to Plaintiff's postings that link to the RayFAQ and which impute a false mental state upon Plaintiff.

207. Injurious falsehoods from Defendant Geiger include those listed in the RayFAQ as set forth above.

208. Injurious falsehoods from Defendant Ross include his depiction of Plaintiff as a "nutjob and a sociopath."

209. Injurious falsehoods from Defendants Formhandle/LTSC include their disparagement of Plaintiff's work via their "killfilter list", their mischaracterization of his contributions to ASF and role in their flamewars, and their constant references to Plaintiff as a "newsloon" that should be shunned and avoided by the "seduction community."

210. At the time of publication, Defendants either knew or should have known that all relevant statements to this count were false.

211. Defendants acted with common-law malice towards Plaintiff.

212. Defendants' statements were not privileged.

213.  The statements were read by third parties.

214. Each statement constitutes a wholly separate injurious falsehood for which each named Defendant (in this count) is either directly or vicariously liable via their participation in the Seduction Mafia as its principals.

215. As a direct and proximate result of Defendants' remarks, Plaintiff has suffered irreparable injury to his professional and personal reputation which will continue in perpetuity unless enjoined by this court.

216. As a direct and proximate result of Defendants' remarks, Plaintiff has suffered incalculable and permanent economic harm, including loss of audience, market share, investment capital, investor appeal, accumulated wealth, loss of sales, business and product reputation, and has made it impossible for Plaintiff to appear in public out of fear for his physical safety and that of anyone who does business with him.

217. For this count, Plaintiff is entitled to relief under one of the applicable injurious-falsehood statutes as set forth hereinabove (libel, slander, trade libel, or false-light defamation), including but not limited to for the following:

    a)    Compensatory damages for all economic losses;

    b)    Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

    c)    Injunctive relief sufficient to terminate the actionable conduct; and

    d)    Costs of suit.

## COUNT VII: LANHAM ACT VIOLATIONS (DEFENDANTS FORMHANDLE/LTSC)

218. Plaintiff incorporates by reference, the entire contents of paragraphs 1-217, as if fully set forth verbatim herein.

### Additional Averments Specific To This Count

219. During the relevant times in controversy, the LTSC website contained a page called "What to do if she disrespects you" at http://www.pickupguide.com/layguide/fox.htm.[33]  This page contains Plaintiff's actual writing, from a USENET post he made in 1999.  The full

---

[33] Pickupguide.com is hosted by LTSC and is part of their content.

USENET message, which was posted with headers indicating Plaintiff's authorship and which contained a link to his site, was edited to remove those identifiers, and Plaintiff's name was credited as "Ray *Parker*" rather than "Ray Gordon." The page has a link at the bottom for "contributions" to the website, and there are sponsor/affiliate links throughout the page.

220. Defendants LTSC/Formhandle committed the Lanham Act violation of "passing off" Plaintiff's work with a false designation of origin (crediting the author as "Ray Parker" and altering the message to remove references to Plaintiff and his website).

221. Defendants LTSC/Formhandle's publication of the ASF FAQ is designed to confuse "newbies" into thinking that it is a "group rule" to visit the LTSC website, for the purpose of hijacking ASF traffic, diverting it to the LTSC website, and demanding payment for a permission to market openly on that site and message boards that would not have been necessary but for Defendants' illegal conduct on ASF.

222. Defendant LTSC/Formhandle's "moderated ASF" postings to USENET are misleading in that they claim that Defendant's commercial message board is a "replacement for ASF," which is a noncommercial, decentralized message board system with no owner and which is not moderated. Indeed, a moderated ASF group on USENET would be called alt.seduction.fast.moderated.

223. Defendant LTSC/Formhandle's "killfilter list" (incorporated into the ASF FAQ) constitutes a direct disparagement of Plaintiff's business and writing in that it deliberately mischaracterizes Plaintiff's role in the "flame wars" on ASF, and advises users not to read his writing while simultaneously claiming to be a credible source of reviews on seduction-related products.

224. The "ASF FAQ" posting also constitutes a passing-off Lanham Act violation in that it attempts to "pass off" the USENET ASF group as the personal property of Defendants LTSC/Formhandle (misleading designation of origin), and because it makes a misleading and inaccurate claim that the LTSC and Speed Seduction websites are "privileged" on ASF and somehow "affiliated" with the group (misleading characterization of goods and services).

225. Defendant LTSC/Formhandle's postings to various internet directories in which it is claimed that the LTSC website is "associated with the ASF newsgroup" again constitute a passing-off Lanham Act violation, as outlined in the preceding paragraph.

226. The statements in controversy as set forth in this Count were designed specifically to cause confusion among the lucrative "newbie" consumer base, i.e., those new readers of ASF who are told by their internet providers to check the "group FAQ" for the rules which govern the group. These "newbies" become much more likely to make purchases through Defendant LTSC/Formhandle's affiliate links rather than Plaintiff's (or other competitors).

227. Defendant LTSC/Formhandle's conduct as set forth in this count has directly and proximately caused Plaintiff pecuniary harm in the form of lost revenue, lost market share, lost audience share, lost goodwill, lost major media exposure, and lost goodwill.

228. Plaintiff is entitled to relief under the Lanham Act, including:

a)    Compensatory damages for all economic losses;

b)    Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

c)    Injunctive relief sufficient to terminate the actionable conduct; and

d)    Costs of suit, including reasonable attorney's fees.

## COUNT VIII:  LANHAM ACT VIOLATIONS AGAINST DEFENDANT ROSS

229.  Plaintiff incorporates by reference, the entire contents of paragraphs 1-228, as if fully set forth verbatim herein.

230.  Defendant Ross conspired with Defendant Formhandle to publish the current "ASF FAQ" by agreeing to approve the FAQ (i.e., by not disparaging Formhandle and through cross-promotion) and its statements regarding the Speed Seduction website being one of the "main group-related sites."  Such a statement presumes an ownership of ASF which does not exist.  The group has no owner.

231.  Defendant Ross is vicariously liable for each publication and republication of the "ASF FAQ," and for all other Lanham Act violations committed on his behalf by other Seduction Mafia principals and operatives.

232.  At the time of publication, Defendant Ross's statement (see paragraph 57(d)) that "[Plaintiff] is a nut job and a sociopath," is one that he either knew or should have known was false, and which was designed to mislead consumers regarding Plaintiff and his work.

233.  Defendant Ross's conduct as set forth in this count has directly and proximately caused Plaintiff pecuniary harm in the form of lost revenue, lost market share, lost audience share, lost goodwill, lost major media exposure, and lost goodwill.

234.  Plaintiff is entitled to relief under the Lanham Act, including:

a)  Compensatory damages for all economic losses;

b)  Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

c)  Injunctive relief sufficient to terminate the actionable conduct; and

d)  Costs of suit, including any reasonable attorney's fees incurred.

69

## COUNT IX: FRAUDULENT/NEGLIGENT MISREPRESENTATION AGAINST DEFENDANT TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA

235. Plaintiff incorporates by reference, the entire contents of paragraphs 1-234, as if fully set forth verbatim herein.

236. Beginning on or about September 13, 2001, Defendant Trustees of the University of Pennsylvania has known the identity of "Wintermute."

237. During the times in controversy, Defendant Trustees of the University of Pennsylvania has made several deliberately misleading representations to Plaintiff, whereby it feigned ignorance regarding Wintermute's identity, for the express purposes of obstructing justice, protecting a student and future potential contributing alumni, and obtaining goodwill by sending a message to incoming students that they "have their back."

238. An additional motivation for Defendant University of Pennsylvania's conduct is to cover up sexual misconduct among its male population, even when it is directed at its female population.

239. Any privilege related to Defendant's misrepresentation to Plaintiff was abused by its fraudulent conduct. Plaintiff further argues that, as a matter of fundamental jurisprudence, fraud destroys any privilege in any situation. Alternatively, Plaintiff pleads a grossly negligent misrepresentation also sufficient to destroy any privilege.

240. As a direct and proximate result of Penn's conduct, Plaintiff has suffered substantial and irreparable economic harm, including increased costs of discovery in Parker v. Wintermute, and any damage resulting from the Seduction Mafia's conduct, which could have been "nipped in the "bud" had Wintermute been located.

241. Plaintiff is entitled to relief under the common-law torts of fraudulent and negligent misrepresentation, including but not limited to for the following:

a)   Compensatory damages for all economic losses;

b)   Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

c)   Injunctive relief sufficient to terminate the actionable conduct; and

d)   Costs of suit.

**COUNT X: ABUSE OF PROCESS AGAINST DEFENDANT WOLF**

242. Plaintiff incorporates by reference, the entire contents of paragraphs 1-241, as if fully set forth verbatim herein.

243. When Defendant Wolf moved this Court to dismiss the claims against all Defendants in Parker v. LTSC, he overstepped his boundaries as counsel for Defendant LTSC.  He was not retained by or otherwise the counsel of record for any of the other Defendants, yet moved this court on their behalf regardless.  Two of the Defendants – Doe #3 a/k/a hcapper@aol.com and Thom E. Geiger – had in fact filed their own pleadings pro-se and did not list Defendant Wolf as their attorney.

244. Defendant Wolf used the legal process of a motion to dismiss the claims against LTSC to accomplish a purpose for which it was not intended, namely to provide "ghost" representation to the alleged co-conspirators of a RICO enterprise that he was charged with distancing his client from.

245. Defendant Wolf acted with the ulterior motive of harming Plaintiff's ability to prosecute Defendant LTSC by cutting off discovery against the other Defendants which may or would have further implicated Defendant LTSC.

246. As a direct and proximate cause of Defendant Wolf's conduct, Plaintiff suffered further economic harm at the hands of the Seduction Mafia, who felt empowered through their "ghost attorney."

247. Defendant Wolf's conduct constitutes the bestowing of economic benefit upon all Defendants for whom he moved to have <u>Parker v. LTSC</u> dismissed.

248. Plaintiff is entitled to relief under the Pennsylvania tort of abuse of process, including but not limited to for the following:

      a)    Compensatory damages for all economic losses;

      b)     Due to the wanton, willful and deliberate nature of the conduct, the maximum punitive damages allowed by law;

      c)    Injunctive relief sufficient to terminate the actionable conduct; and

      d)    Costs of suit.

## COUNT XI: INVASION OF PRIVACY AGAINST DEFENDANTS ROSS, GEIGER AND LTSC

249. Plaintiff incorporates by reference, the entire contents of paragraphs 1-248, as if fully set forth verbatim herein.

250. The relevant conduct to this count is as follows:

      a.    The portrayal by the RayFAQ of Plaintiff as incompetent to the point of requiring involuntary commitment;

      b.    The incitement by Defendant Ross for others to abuse process via discovery if sued by Plaintiff;

      c.    The direction and/or incitement of Player88 threatening to stalk Plaintiff "offline" through his own residence;

      d.    The publication of the RayFAQ, for which Defendant Geiger is responsible;

     e.    The designation of the RayFAQ as being "official," and thus violating Plaintiff's right to publicity.[34]

     f.    All other relevant acts averred in this Complaint.

251. For all relevant conduct in this count, each named defendant is directly or vicariously liable through the Seduction Mafia.

252. For each relevant act, Plaintiff is entitled to relief under the Pennsylvania tort of invasion of Privacy.

253. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered a loss of privacy and a loss of enjoyment of life, and increased difficulty in conducting his affairs due to reduced esteem in the eyes of third parties.

254. Plaintiff is entitled to compensatory damages for his loss of privacy, and for all secondary damages which can be attributed to the loss of privacy.

255. Plaintiff is entitled to injunctive relief sufficient to terminate the actionable conduct;

256. Because of the deliberate and malicious nature of the conduct averred herein, Plaintiff is entitled to the maximum punitive damages allowed by law.

257. Plaintiff is entitled to costs of suit.

## PRAYER FOR RELIEF

Plaintiff seeks the following relief:

     1.    For each count, or any combination of all counts, compensatory damages in an unspecified amount to be proven at trial, but which is not less than TWO BILLION AMERICAN DOLLARS ($2,000,000,000.00 US);[35]

---

[34] To the best of Plaintiff's knowledge, this tort has neither been recognized nor rejected by the Pennsylvania Supreme Court. The right to publicity is recognized in several other states as part of the right to privacy.

[35] The valuation of dominant internet publishers is many times even this amount; the internet is literally "up for grabs," and Plaintiff has been denied the fair chance to compete for its spoils.

2.   Treble damages for those damages attributed to the RICO enterprise;

3.   Transfer of the ray-gordon.com domain to Plaintiff, so that he may mitigate his

damages;

4.   The maximum punitive damages allowed by applicable law;

5.   Injunctive relief sufficient to terminate the actionable conduct;

6.   Costs of suit, including reasonable attorney fees; and

7.   Such other and further relief as this court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands the right to a trial by jury in this case.

This the 9th day of June, 2005.

Gordon Roy Parker
Plaintiff, Pro Se
4247 Locust Street, #806
Philadelphia, PA  19104
(215) 386-7366
SnodgrassPublish@aol.com

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **GORDON ROY PARKER**, a.k.a. **Ray Gordon,** d/b/a **Snodgrass Publishing Group,** 4247 Locust Street, #806 Philadelphia, PA 19104 <br><br> Plaintiff, <br><br> v. <br><br> **Learn The Skills Corp.**, c/o Business Filings, Inc., 9 East Lockerman Street, Suite 205 Dover, DE 19901; **Formhandle@Fastseduction.com,** c/o Business Filings, Inc., 9 East Lockerman Street, Suite 205 Dover, DE 19901; **Thom E. Geiger,** 817 North McCrary Road, Columbus, MS 39702-4320; **Paul Ross,** a/k/a "Ross Jeffries" a/k/a ErosLA77@aol.com, 310 Tahiti Way, Marina Del Ray, CA, 90292-6789, **Trustees of the University of Pennsylvania,** 133 South 36th Street, 3rd Floor, Philadelphia, PA 19104, **Matthew S. Wolf, Esq.,** 1236-K Brace Road, Cherry Hill, NJ, and John Does 1-10, <br><br> Defendants. | : : : : : : : : : : : : : : : : : : : : : : : | **CASE NO.:** <br><br> Hon. ~~James R. Kelly~~ |

## VERIFICATION

I, Gordon Roy Parker, an adult male domiciled and residing at the address listed for me in the caption, hereby duly and solemnly swear, under all relevant perjury statutes, that all averments of fact in the foregoing **complaint** are true and correct to the best of my knowledge.

This the 9th day of June, 2005.

*Gordon Roy Parker*

Gordon Roy Parker
Plaintiff, Pro Se
4247 Locust Street, #806
Philadelphia, PA 19104
(215) 386-7366
SnodgrassPublish@aol.com